

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-13-1995

# Tabas v Tabas

Precedential or Non-Precedential:

Docket 92-1495

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Tabas v Tabas" (1995). *1995 Decisions.* Paper 42.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/42

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 92-1495; 92-1529


HARRIETTE S. TABAS; RICHARD S. TABAS;
NANCY C. TABAS; GERALD LEVINSON,
As Executors of the Estate of CHARLES L. TABAS


Appellants


v.


DANIEL M. TABAS; JOSEPH P. CAMPBELL;
JAMES J. MCSWIGGAN; LEE A. TABAS; ROBERT TABAS;
SUSAN TABAS TEPPER; LINDA TABAS STEMPEL;
JOANNE TABAS WURZAK; CAROL TABAS STOFMAN; HOWARD WURZAK


On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 91-01355)


Argued: January 26, 1993
Before: GREENBERG, ROTH and LEWIS,
Circuit Judges

Reargued In Banc October 18, 1994
Before: SLOVITER, Chief Judge, BECKER, STAPLETON,
MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN,
NYGAARD, ALITO, LEWIS, ROTH, MCKEE,
Circuit Judges

(Opinion Filed February 13, 1995)


Richard A. Sprague, Esquire (Argued)
Daniel L. Lemisch, Esquire

Denise Pallante, Esquire
Sprague & Sprague
135 South 19th Street
Wellington Building, Suite 400
Philadelphia, PA 19103

Howard K. Goldstein, Esquire
Astor, Weiss, Kaplan & Rosenblum
Broad Street at Walnut
The Bellevue, Sixth Floor
Philadelphia, PA  19102
         Attorneys for Appellants

Harold E. Kohn, Esquire
Robert J. LaRocca, Esquire
Joanne Zack, Esquire (Argued)
Kohn, Nast & Graf, P.C.
1101 Market Street, 24th Floor
Philadelphia, PA 19107
         Attorneys for Appellees

OPINION OF THE COURT

ROTH, <u>Circuit Judge</u>:

In this action, brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Pub. L. 91-452, Title IX, 84 Stat. 941, as amended, 18 U.S.C. §§ 1961-1968, we are presented with the question whether defendants' acts, as alleged, constituted a "pattern of racketeering activity." Specifically, we must determine what showing is required for plaintiffs to meet the "continuity" prong of RICO's "pattern" requirement. Because we find that plaintiffs have alleged a series of acts sufficient to satisfy RICO's continuity requirement, we will reverse the

district court's grant of summary judgment and remand this case for further proceedings consistent with this opinion.

The plaintiffs are four of the executors of the Estate of Charles Tabas ("the Estate"): Charles's widow, Harriette Tabas; Richard Tabas and Nancy Tabas, two of Charles and Harriette's children; and Gerald Levinson, one of Charles's business associates.[1] In addition to Daniel Tabas, who is President and Chief Executive Officer of Tabas Enterprises, the named defendants include Joseph Campbell, the Executive Vice President of Tabas Enterprises; James McSwiggan, the Comptroller of Tabas Enterprises; Daniel's children; and one of Daniel's sons-in-law.

I.

A.

In 1964, brothers Charles and Daniel Tabas formed a partnership, Tabas Enterprises, to conduct real estate and other business ventures. The partnership agreement governing the brothers' joint property holdings required that, in the event of the death of either partner, the surviving partner would distribute partnership income equally to himself and to the estate of the deceased partner, regardless of any personal

---

[1]There are six heirs to the Estate, including the Charles L. Tabas Foundation.

services either brother might render.  <u>See</u> Appendix ("App.") at 62 (Partnership Agreement ¶ 3).  The partnership agreement also provided that:

> It is the intent of the parties that the survivor of them shall be free to exercise his judgment for the joint benefit of ownership . . . provided always, that the responsibility and obligation of the survivor to the estate of the deceased shall be that required of a fiduciary.

App. at 62 (Partnership Agreement ¶ 4(b)).

In 1983, Charles Tabas died.  Soon after Charles's death, John Van Der Wal, a financial advisor to Daniel and to Tabas Enterprises, was asked by Daniel to recommend a reasonable financial arrangement between Daniel and Charles's widow, Harriette.  In response, Van Der Wal sent a letter to Harriette in which he recommended that Daniel receive a $180,000 annual management fee from Tabas Enterprises, prior to profit sharing by the partners.  Van Der Wal further recommended that Harriette and Daniel each receive a $10,000 monthly draw check from Tabas Enterprises.[2]

Beginning in March 1983, monthly distribution checks of $10,000 were drawn on a Tabas Enterprises account and sent to Harriette through the United States mail.  Daniel was also provided with a $10,000 monthly draw.  In addition, from March

---

[2]Prior to Charles's death, each brother received a monthly disbursement of $10,000 from Tabas Enterprises.  In addition, the brothers appeared to have an arrangement under which Tabas Enterprises paid for many personal and business expenses.

1983 to September 1986, Tabas Enterprises paid for various personal expenses incurred by Harriette and Daniel.

In September 1986, Tabas Enterprises stopped paying Harriette's personal expenses and also eliminated Harriette's $10,000 monthly draw.  Instead, Tabas Enterprises began paying a $15,000 monthly draw to the Estate.  At the same time, Daniel's monthly draw was increased to $15,000.  Tabas Enterprises continued to pay Daniel management fees and to cover his personal expenses.[3]

Shortly thereafter, the Estate brought suit against Daniel and others in the Montgomery County, Pennsylvania, Court of Common Pleas.  The complaint alleged, inter alia, that the Estate was not being allocated an equal share of the partnership income, that Daniel used Tabas Enterprises funds for personal purposes, that Daniel misled the Estate by directing the preparation of false and misleading financial statements, and that Daniel had breached his fiduciary duties to the Estate.

---

[3]The parties dispute whether plaintiffs were aware that Daniel was receiving substantial compensation from Tabas Enterprises in addition to his monthly draw check.  Defendants argue that, soon after Charles's death, plaintiffs knew of Daniel's compensation and therefore could not have been deceived by the monthly checks which served as the basis of the mail fraud predicate acts.  Plaintiffs acknowledge that they believed Daniel was taking more than he was entitled to under the partnership agreement; this was partly the basis for the 1986 state suit.  They contend, however, that they did not know the extent to which they were being short-changed until Price Waterhouse was given access to Tabas Enterprises' records.  Consequently, plaintiffs assert that they initiated this suit as soon as they discovered the extent of the alleged fraudulent activity.

On November 20, 1987, the parties settled the state suit and agreed that the assets of Tabas Enterprises would be sold. The settlement agreement established a schedule and method for liquidating the majority of the jointly held properties.[4] In conjunction with the liquidation of the joint assets, the settlement agreement provided that "the Estate shall be given complete access to all properties, books and records in connection therewith[.]" App. at 67 (Settlement Agreement at ¶ 4(a)(i)). The settlement agreement did not address the distribution of income earned after November 20, 1987, but did provide that:

> To the extent that the Partnership Agreement dated March 12, 1964 is not inconsistent with the provisions of this [Settlement] Agreement, the Partnership Agreement shall continue in full force and effect until the liquidation and auction [of Tabas Enterprises' assets] are completed.

App. at 70 (Settlement Agreement ¶ 13). Another provision of the settlement agreement provided that the parties would agree to execute a mutual general release:

---

[4]The settlement agreement also provided that Daniel would purchase the Estate's interest in Acorn Iron and Supply Company and $1.5 million in Royal Bank stock. In addition, the Estate's interest in property on City Line Avenue was transferred to Daniel, apparently in exchange for monies from Tabas Enterprises. Defendants, pointing to the $16.9 million that the Estate has received pursuant to the settlement agreement and liquidation of Tabas Enterprises, assert that plaintiffs have been treated equally. While plaintiffs do not appear to dispute the amount the Estate has received, they do assert that it has not received an equal one-half of the income as required under the partnership agreement.

requiring the dismissal with prejudice of all parties in all litigation between or among Daniel, on the one hand, and the Estate or any of its executors, on the other hand, and excluding only the terms and conditions contained herein.

App. at 69 (Settlement Agreement ¶ 9).

Lastly, the Honorable William H. Yohn, Jr.,[5] was named to act as the arbitrator of any future disputes arising from the implementation of the settlement agreement that could not be resolved by the parties' legal representatives. The settlement agreement specifically provided that Judge Yohn's decisions on such matters "shall be final, binding, and non-appealable." App. at 70 (Settlement Agreement ¶ 12).

On May 15, 1990, Daniel and the Estate executed the mutual general release, which provided that, except for the obligations of the parties under the settlement agreement, the parties would release and forever discharge one another from:

any and all actions, causes of action, demands, judgments, contracts, debts, dues, accounts, bonds, covenants, contracts, suits, claims, and demands of any nature whatsoever, whether in law, equity, arbitration or otherwise, whether know [sic] or unknown at the present time, which [either party] ever had, now has, hereinafter can, shall or may have, by reason of any matter, cause or thing whatsoever, from the beginning of the world to November 20, 1987.

App. at 293 (emphasis added).

---

[5]At that time, Judge Yohn sat on the Pennsylvania Court of Common Pleas. He is now a United States District Judge for the Eastern District of Pennsylvania.

Despite the settlement agreement, plaintiffs remained dissatisfied with Daniel's compliance with the partnership agreement. On July 25, 1990, Judge Yohn held a hearing to consider whether the settlement agreement barred the Estate from asserting claims for breach of the partnership agreement stemming from Daniel's management of Tabas Enterprises subsequent to November 20, 1987. Finding that "[t]he provision of the partnership agreement of March 12, 1964 concerning distribution of income is not inconsistent with the provisions of the settlement agreement . . . as the settlement agreement contains no provisions concerning the distribution of income after November 20, 1987," Judge Yohn held that the Estate could "pursue any claims" against Daniel arising from the distribution of Tabas Enterprises' income after November 20, 1987. App. at 1187 (Arbitration Award No. 8).[6]

Following this decision, Daniel's counsel requested that Judge Yohn mediate the issues raised by plaintiffs' proposed RICO complaint. Judge Yohn held two conferences with counsel to discuss, among other topics, the proposed RICO claims. During oral argument on February 1, 1991, Daniel's counsel asserted that, because plaintiffs' proposed RICO complaint sought damages

---

[6]These rulings were premised upon Judge Yohn's finding that: "By agreement of the parties and with the concurrence of the arbitrator, the arbitrator has jurisdiction to rule upon the issue of whether the Estate may make claims against Daniel M. Tabas concerning his management of Tabas Enterprises subsequent to November 20, 1987." App. at 1185.

against defendants not named in the settlement agreement, the proposed RICO complaint was outside the scope of arbitration and therefore could not be decided by Judge Yohn in his role as arbitrator. Nevertheless, Daniel's counsel expressed interest in having Judge Yohn serve as a mediator in an attempt to resolve the claims set forth in the proposed RICO complaint.

On February 20, 1991, Judge Yohn formally denied Daniel's request to mediate the dispute. Instead, Judge Yohn ordered that: "By agreement of the parties, and with the concurrence of the undersigned, the proposed 'RICO Complaint' may be filed in the United States District Court for the Eastern District of Pennsylvania and the issues raised therein will not be the subject of this procedure under the [Settlement] Agreement of November 20, 1987." App. at 1282 (Arbitration Award No. 10).

Soon thereafter, plaintiffs brought the instant action, alleging violations of RICO §§ 1962(a), (b), (c), and (d), as well as several state law claims stemming from defendants' handling and distribution of Tabas Enterprises assets. The initial complaint was filed on March 4, 1991. The amended complaint was filed on May 20, 1991.[7]

_____

[7]On May 29, 1991, the district court entered a scheduling order. This schedule provided, inter alia, that discovery be completed by December 2, 1991. The schedule also provided that defendants' motion for summary judgment had to be filed on or before October 21, 1991, and that plaintiffs' response was due by November 4, 1991. Because this schedule required plaintiffs to respond prior to the completion of discovery, and because the parties had further disagreements about discovery, the factual record is not fully developed. Nonetheless, the record is

Plaintiffs have appealed the district court's grant of defendants' motion for summary judgment. On appeal, we are required to base our review of the district court's decision on the evidence of record. Accordingly, before we turn to the merits of the parties' assertions, we will summarize the record submitted to this court.

Most significantly, the record contains two financial reports by Price Waterhouse, analyzing Tabas Enterprises' financial and operational records. Plaintiffs' counsel retained Price Waterhouse to determine whether these records reflected the equal distribution of income to the Estate as required under ¶ 3 of the partnership agreement.

The first Price Waterhouse report analyzed Tabas Enterprises' financial records dating from Charles's death in 1983 through early 1990, focusing on the period after November 20, 1987. Then, in late 1991, after the amended complaint was filed, Price Waterhouse completed a supplemental report, analyzing Tabas Enterprises' records from October 1989 through July 1991. In total, the Price Waterhouse reports documented more than three and one-half years of activity subsequent to the November 1987 settlement agreement. In both reports, Price Waterhouse concluded that "the books and records of Tabas

sufficient to support our conclusion that the requisites for RICO continuity have been met.

Enterprises do not reflect the equal distribution of income," and that "indications of fraud exist."[8]  App. at 352, 460–61.

The Price Waterhouse reports revealed a continuing series of transactions to divert Tabas Enterprises' income for the personal use of Daniel and his family, through direct monetary benefits as well as other types of benefits.  In its first report, for instance, Price Waterhouse itemized a substantial number of items, purchased with Tabas Enterprises' income, for which there was no adequate documentation or explanation substantiating an ordinary and necessary business purpose for the expense.  The report noted that, to the extent that Daniel purchased these items using Tabas Enterprises' income, such expenses "would inappropriately reduce the Estate's interest in Tabas Enterprises by reducing income available for distribution to the Estate."  App. at 354.  According to the Price Waterhouse report, these purchases included personal apparel, homeowner's dues for Daniel's vacation home in Vermont, meals and other purchases in cities where Daniel had vacation homes, meals and other purchases in ten foreign countries,

---

[8]Price Waterhouse noted that its formal "opinion" was subject to scope limitations as discussed within each report.  Our review of these limitations indicates that most were caused by Tabas Enterprises' failure to cooperate with the Price Waterhouse auditors.  In addition, Price Waterhouse described Tabas Enterprises' major records depository as in a "state of disarray."  In considering these reports, we will weigh the effect of the scope limitations in light of our conclusion that most limitations to the analysis were a result of Tabas Enterprises' efforts to hinder the Price Waterhouse audits.

prescription medicine, and a pool heater installed at Daniel's home in Pennsylvania.  The total cost of these and other similar expenses was approximated at $140,000.

Other problem areas cited in the first report were Tabas Enterprises' payment of $67,000 in compensation for the provision of home services, such as maid, gardening, and handyman services, for Daniel and his family; the assignment of 24 automobiles owned by Tabas Enterprises to Daniel and his family, including family members who were not employed by Tabas Enterprises; Tabas Enterprises' payment of the automobile insurance, repairs and maintenance, gasoline,[9] car phones, auto club membership, registration fees, tags, and title fees for all 24 cars; Tabas Enterprises' payment of telephone bills for Daniel's primary and vacation residences; and Tabas Enterprises' payment of insurance coverage for non-partnership assets, including Daniel's six antique automobiles.

Price Waterhouse's second report noted that, between the completion of the first and second reports, Daniel had reimbursed Tabas Enterprises for only a small portion of these expenses.[10]  The second report also noted that many of the

---

[9]The report found these gasoline charges, in excess of $18,000, especially problematic, since the relevant documents revealed routine submissions of multiple requests for reimbursement arising from a single receipt.

[10]In his deposition, Daniel testified that all unreimbursed expenses represented legitimate business expenses.  For most of these expenses, however, Daniel could not provide any specific recollection of the business purpose involved.

questionable expenses detailed in the first report continued to occur. For instance, the second report identified an additional $78,000 in payments for personal services and an additional $35,000 in phone bills for Daniel's private residences and mobile telephones. The second report also noted that Daniel and his family continued to charge personal items to Tabas Enterprises, including personal apparel, homeowner's dues for his vacation home in Vermont, and meals.

In addition to investigating nonmonetary benefits, the Price Waterhouse reports also examined the direct monetary benefits received by Daniel and his family from Tabas Enterprises. The reports found that between November 1987 and November 1989, Daniel received $1,502,000 in salary partnership distributions, management fees and incentives, gratuities, and bonuses from Tabas Enterprises, and that for the period between November 1989 and June 1991, he received $1,166,000. The reports also found that, during this period, in which Daniel was paid a total of $2,668,000, the Estate received partnership distributions totalling $660,000.[11]

According to the Price Waterhouse reports, the monetary payments to Daniel's family during this time also eclipsed those

_____

[11]Price Waterhouse also noted that, in addition to his Tabas Enterprises income, Daniel received compensation as Chairman of the Board of Royal Bank. At his deposition, Daniel testified that he worked 60-70 hours per week for Tabas Enterprises, app. at 1683, and that his Royal Bank time commitment consisted of Thursday morning executive staff meetings and a board meeting one evening each month. App. at 614.

received by the Estate. The reports documented that between November 1987 and June 1991, Daniel's family, including his six children and one son-in-law, received $1,363,000 from Tabas Enterprises in the form of salaries, management fees and incentives, gratuities, bonuses, and consulting fees. The amended complaint alleges that payments to Daniel's children and son-in-law "do not constitute reasonable salaries for work which they actually performed and that some of those children and/or their spouses were 'phantom' or 'ghost' employees who performed little or no work at all." App. at 21 (Amended Complaint ("AC") ¶ 25).

The first Price Waterhouse report also noted that, in addition to receiving compensation from Tabas Enterprises, certain members of Daniel's family also worked for and received compensation from Royal Bank. For instance, Lee Tabas served as President of Royal Bank, Robert Tabas served as Vice President, and Susan Tabas Tepper served as Director of Marketing.

Finally, in addition to the above findings, both Price Waterhouse reports noted that "the Estate may also have been subjected to the risk of additional taxes, interest, and penalties" due to apparent Internal Revenue Service reporting violations by Tabas Enterprises. App. at 362, 467.

B.

Count I of the amended complaint alleges that, in violation of 18 U.S.C. § 1962(a), (b), and (c), the defendants

conspired to defraud the Estate of its equal share of Tabas Enterprises' income, to which it was entitled under the partnership agreement, through a pattern of racketeering activity including mail fraud in violation of 18 U.S.C. § 1341.[12] Specifically, plaintiffs allege that defendants conducted a scheme to defraud the Estate of its equal share of the partnership's income by wrongfully diverting Tabas Enterprises funds to pay for the personal expenses of Daniel and his family and by understating the Estate's share of the income. Plaintiffs assert that, from the time of Charles's death through the period in which the amended complaint was filed, Daniel "continuously made false representations to the Estate by mail and fraudulently distributed millions of dollars of Tabas Enterprises' funds to himself and to members of his family in a scheme to defraud the Estate of income to which it was entitled." App. at 20 (AC ¶ 24).

Plaintiffs specifically allege that Daniel, Campbell, and McSwiggan committed forty-one acts of mail fraud between December 1987 and February 1991 for "the purpose of executing the

_____

[12]Count II of the amended complaint alleges that defendants violated § 1962(d) by conspiring to violate subsections (a), (b), and (c).

Counts III-VI of the amended complaint allege state law claims that are not central to this appeal, including breach of fiduciary duty, breach of contract, fraud, and conversion. The district court dismissed these state law claims without prejudice. Because we find that the district court erred in dismissing Counts I and II, we will instruct the district court to vacate the dismissal of plaintiffs' supplemental state law claims.

scheme to defraud the Estate of its equal share of income." App. at 43 (AC ¶ 49).[13] Thirty-nine of these forty-one acts represented monthly disbursements of $15,000 from Tabas Brothers (a holding of Tabas Enterprises) to the Estate. The remaining two acts involve the mailing of various IRS forms from Tabas Enterprises to the Estate reflecting income earned and business expenses incurred by certain Tabas Enterprises entities. Plaintiffs contend that the mailing of the monthly checks by defendants "constituted an intentional misrepresentation" that one-half of the income of Tabas Enterprises was being paid to the Estate pursuant to the partnership agreement. App. at 46 (AC ¶ 50).

Finding that the dispute did not present a sufficient threat to satisfy RICO's "continuity" requirement, the district court granted defendants' summary judgment motion. The district court reasoned that:

> Plaintiffs' claims essentially allege one fraudulent scheme perpetrated against one victim by one perpetrator. The gist of plaintiffs' complaint is that Daniel Tabas has failed to abide by the partnership agreement made with his brother, Charles, and that Daniel has employed various methods of trickery to

---

[13]Plaintiffs also allege as predicate acts defendants' use of the United States mails to send checks to Daniel's children and son-in-law for work not performed. We do not rely on these allegations, however, because plaintiffs have not produced any evidence to counter McSwiggan's deposition testimony that these checks were delivered by courier. See, e.g., Utz v. Correa, 631 F.Supp. 592, 596 (S.D.N.Y., 1986) (delivery of letter by messenger did not violate the mail fraud statute since the United States mails were not used).

cheat Charles's heirs of their fifty percent share of the business that Charles and Daniel built. The sole victim of this scheme is Charles Tabas's estate. The sole perpetrator is Daniel Tabas or individuals under his control. No one else is affected. There is no threat to the community at large. This is not a case where the predicate acts are "part of an entity's regular way of doing business," such as would affect others doing business with the entity.

The partnership between Charles and Daniel is currently in the process of liquidation. All of the fraudulent activity alleged in this suit will cease once the liquidation process is complete. Given the Court of Appeals' admonition that "[i]t remains an open question whether RICO liability is ever appropriate for a single-scheme, single-victim conduct threatening no future harm," we simply do not find that the defendants' alleged conduct in this case "pose[s] a societal threat worthy of the draconian penalties and remedies available under RICO."

District Court opinion at 8-10; App. at 1376-78 (citations omitted) (footnotes omitted). Plaintiffs filed a timely notice of appeal of the district court's grant of summary judgment to defendants. Defendants also filed an appeal, seeking review of the district court's decision to dismiss the state claims without prejudice. Following the filing of the panel's decision, we granted appellants' petition for rehearing in banc and vacated the panel opinion.

II.

The district court had subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331 and 1367. The district court's federal question jurisdiction was invoked because Counts I and II of the amended complaint raise claims under RICO, 18 U.S.C. §§ 1961 and 1962. The district court's

supplemental jurisdiction was invoked because Counts III through VI of the amended complaint raise claims that are so related to the claims in Count I and II that they form part of the same case or controversy under Article III of the United States Constitution. The district court's supplemental jurisdiction was invoked because Counts III through VI of the amended complaint raise claims that are so related to the claims in Count I and II that they form part of the same case or controversy under Article III of the United States Constitution. Under 28 U.S.C. § 1291, this Court has appellate jurisdiction over the final orders of the district court.[14]

This Court has plenary review over the district court's grant of summary judgment. See Northern Ins. Co. v. Aardvark Assocs., 942 F.2d 189, 194 n.5 (3d Cir. 1991). On review of the district court's order for summary judgment, "we 'apply the same test the district court should have utilized initially.'" Erie Telecommunications v. Erie, 853 F.2d 1084, 1093 (3d Cir. 1988) (citation omitted). "In reviewing a grant of summary judgment, we must be convinced 'that the prevailing party has successfully demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

---

[14]The district court's first order, dated May 26, 1993, granted defendants' motion for summary judgment on Counts I and II, and dismissed Counts III, IV, and V pursuant to 28 U.S.C. § 1367(c)(3). The district court's second order, dated June 2, 1993, amended the first order to include dismissal of Count VI pursuant to § 1367(c)(3).

matter of law.'" Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

In determining whether summary judgment is appropriate, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

III.

The first issue we must address is defendants' contention that this lawsuit is precluded by the 1987 settlement agreement and the 1990 mutual release. This question was considered by the panel only. We find defendants' argument to be without merit.

First, binding arbitration by Judge Yohn holds the present claims viable. The settlement agreement provides for final, binding arbitration of any dispute "as to the provisions of this Agreement or as to the implementation or operation of the provisions of this Agreement" between Daniel and the Estate. App. at 70 (Settlement Agreement ¶ 12). The very issue of whether claims such as this lawsuit could be brought was submitted to Judge Yohn, the arbitrator, who determined initially that "the arbitrator has jurisdiction to rule upon the issue of

whether the Estate may make claims against Daniel M. Tabas concerning his management of Tabas Enterprises subsequent to November 20, 1987." App. at 1185 (Arbitration Award No. 8). On the merits, Judge Yohn held that the Estate could pursue any claims which it might have against Daniel "for an alleged breach of his fiduciary duty [to the Estate] after November 20, 1987," and "for the unequal distribution of the income of Tabas Enterprises subsequent to November 20, 1987." Id. at 1187.

Under the settlement agreement, Judge Yohn's decision is "final, binding, and non-appealable," app. at 70 (Settlement Agreement ¶ 12), and we must adhere to it under federal and Pennsylvania law. See Apex Fountain Sales v. Kleinfeld, 818 F.2d 1089, 1094-95 & n.4 (3d Cir. 1987) (an arbitrator's decision is binding under federal law unless "an arbitrator 'manifests an infidelity'" to her obligation to interpret the agreement at issue, or there is "corruption, fraud or partiality," or a party was denied a "fundamentally fair hearing") (citations omitted); International Brotherhood of Firemen & Oilers v. School Dist., 350 A.2d 804, 808 (Pa. 1976) (an arbitrator's decision shall not be set aside "unless it is alleged and proven by clear, precise and convincing evidence that the parties were denied a hearing or that there was fraud, misconduct, corruption or some other irregularity of this nature on the part of the Arbitrator which caused him to render an unjust, inequitable or unconscionable finding"). Defendants have not alleged any action on the part of

Judge Yohn amounting to corruption, fraud, or partiality. In addition, defendants have presented no evidence that Judge Yohn failed to provide a hearing to consider each party's views prior to his decision. In fact, the record clearly indicates that Judge Yohn held a hearing on this question and considered numerous exchanges of correspondence before ruling on this matter.

Second, even if we were to make our own evaluation of whether the 1987 settlement agreement and the 1990 release precluded this lawsuit, we would conclude that it does not. Defendants' reliance on Main Line Theatres, Inc. v. Paramount Film Distrib. Corp., 298 F.2d 801 (3d Cir.), cert. denied, 370 U.S. 939 (1962), is misplaced. Defendants assert that Main Line stands for the proposition that where "the initial lawsuit contained prayers for injunctive relief, the execution of a general release releases and extinguishes complaints for future conduct." Defendants-appellees' Brief at 21. Consequently, defendants contend, plaintiffs' suit is barred by the settlement agreement and the mutual release signed by the Estate and Daniel.

In Main Line, plaintiffs demanded injunctive relief and treble damages in a civil antitrust suit stemming from Paramount's distribution of motion pictures. The district court dismissed the suit, holding that the case had been settled during pre-trial negotiations by an "oral agreement" between the parties. The oral agreement provided that Main Line would drop

its suit in exchange for $10,000. Main Line refused to comply with the oral agreement, however, complaining that Paramount attempted to add language to the agreement when it was memorialized in writing. Specifically, Main Line rejected language that required it to acknowledge that the complained of distribution procedures were reasonable.

Main Line appealed the dismissal to this court. We then considered whether the initial oral agreement included a release to the effect that Paramount could continue to distribute films in the same manner it had prior to Main Line's suit for injunctive relief. We noted:

> Had this been an action for damages only, without a prayer that the defendants be restrained from continuing or repeating the licensing practices of which the plaintiff complained, the essential feature of any understanding to settle the suit for a stated sum would have been the plaintiffs' promise to forego a money claim, the only matter in controversy. Here, the suit contained a demand for injunctive prohibition of future wrongful conduct as well as a claim for money damages for alleged past misconduct. In such circumstances a reasonable person agreeing, without any expression of limitation, to accept a sum in settlement of the litigation should and reasonably would understand that both aspects of the suit were covered by the settlement.

298 F.2d at 803 (emphasis added).

In Main Line, plaintiffs could point to no limitations, expressed or implied, in their oral agreement with defendants. Accordingly, their settlement agreement covered their prayers for both injunctive relief and money damages. In the present case,

however, the mutual release signed by plaintiffs and Daniel expressly limits the applicability of the release to any claims arising "from the beginning of the world to November 20, 1987." App. at 294. This express limitation distinguishes the instant case from the facts presented in Main Line.

Defendants also draw the Court's attention to our statement in Main Line that "[c]ertainly, a defendant offering a sum in settlement of a suit asking, among other things, for an injunction against similar conduct, would not understand that a similar demand could be asserted the day after settlement." 298 F.2d at 803 (emphasis added). The Estate's state suit here, however, although denominated a "Complaint in Equity," did not seek broad injunctive relief. The holding in Main Line relies on the fact that the plaintiff specifically sought to enjoin Paramount from distributing motion pictures using methods that plaintiff alleged violated the civil antitrust laws. In the instant case, the plaintiffs' state suit asked that Daniel be removed from any position at Tabas Enterprises and that its businesses and properties be liquidated. Rather than controlling future conduct, the state suit primarily sought a dissolution of Tabas Enterprises and redress for the alleged past wrongs committed against the Estate's interest in the partnership. It follows, therefore, that the subsequent federal action did not constitute an effort to enjoin conduct that the settlement of the first suit had resolved. This determination, together with our

earlier finding that the settlement agreement bars only claims existing up to November 20, 1987, would lead us to conclude that defendants' reliance upon Main Line is misplaced.

## IV.

Having found that plaintiffs' lawsuit is not precluded by the 1987 settlement agreement and the 1990 mutual release, we now turn to the district court's decision that plaintiffs failed to allege a course of conduct sufficient to establish a RICO "pattern of racketeering conduct" because plaintiffs failed to satisfy RICO's "continuity" requirement.

The RICO statute provides for civil damages for "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). A common thread running throughout § 1962 is that an injured party must demonstrate that the defendant was engaged in a "pattern of racketeering activity." Section 1962(a) prohibits "any person who has received any income derived . . . from a pattern of racketeering activity" from using that money to acquire or operate any enterprise engaged in interstate commerce. Section 1962(b) prohibits any person from acquiring, maintaining an interest in, or controlling any such enterprise "through a pattern of racketeering activity." Section 1962(c) prohibits any person employed by or associated with an enterprise engaged in interstate commerce from conducting or participating in the affairs of the enterprise through "a pattern of racketeering

activity."  Finally, section 1962(d) prohibits any person from conspiring to violate subsections (a), (b), or (c).

Central to the dispute in this case is the question whether defendants participated in "a pattern of racketeering activity."  The RICO statute defines a "pattern" of racketeering activity as requiring "at least two acts of racketeering activity" within a ten year period.  18 U.S.C. § 1961(5).  The statute also enumerates the offenses which constitute "racketeering activity," including crimes that have traditionally been associated with the transgressions of racketeers:  murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, and dealing in narcotic or other dangerous drugs.  18 U.S.C. § 1961(1).  The statutory enumeration is, however, expansive and goes on to include specific federal offenses which, although they may often be committed by those whom we would categorize as "racketeers," also fall into the category of common law or "garden variety" fraud and which would, in the past, have been the subject of commercial litigation under state law.  Among these broadly delineated federal offenses are mail fraud and wire fraud.[15]  These offenses are the ones that

---

[15]Mail fraud, 18 U.S.C. § 1341, is the racketeering activity involved in the case before us.  Section 1341 provides in pertinent part:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice . . . places in any post office or authorized depository for mail matter, any

many consider to be the most troublesome as RICO predicate acts.

The inclusion within the scope of civil RICO of these types of fraud, more prevalent in the commercial world than in the world of racketeers, has caused concern that RICO sweeps too broad a swathe.  See, e.g., Note, Civil RICO:  The Temptation and Impropriety of Judicial Restriction, 95 Harv. L. Rev. 1101, 1105 (1982) ("Given the prevalence of mail and wire use in commercial transactions, RICO's provision for a private cause of action predicated on violations of the mail and wire fraud statutes virtually federalizes common law fraud").

---

matter or thing whatever to be sent or delivered by the Postal Service, . . . shall be fined not more than $1,000 or imprisoned not more than five years, or both.

The federal offense of mail fraud was originally enacted by Congress in 1872 as a part of the recodification of the postal laws.  The Supreme Court in its first review of the mail fraud statute made clear that its scope was broad.  The Court held that the statute reached beyond the common law definition of "false pretenses" to encompass "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future."  Durland v. United States, 161 U.S. 306, 313 (1896).  Fraud, involving the use of the postal system to carry it out, was made a federal offense by Congress with the "purpose of protecting the public against all such intentional efforts to despoil, and to prevent the post office from being used to carry them into effect . . .."  Id. at 314.

Judge Greenberg, in his dissent, queries whether Congress intended RICO to be applied to a defendant, participating in a scheme to defraud, who mails substantial payments but not to a similar defendant who delivers the payments by hand.  See [typescript at 14].  The clear answer to this question is "yes" because, first, the former example constitutes mail fraud and the latter does not and, second, Congress has chosen to include mail fraud as a RICO predicate act.

If we examine the language of the statute itself, in an attempt to discern the scope of civil RICO, we find ourselves lost in a land with few signposts. Section 1961(5) defines "pattern" as requiring "at least two acts of racketeering activity." The breadth of the predicate acts, described in § 1961(1), combined with § 1961(5)'s loose definition of pattern, has led many courts to recoil from the inclusion within RICO of offenses which were not considered to be the crimes of gangsters. Such court-imposed limitations on the scope of civil RICO were first reviewed by the Supreme Court in Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985). In Sedima, the Supreme Court set out an expansive definition of the concept of "pattern" in civil RICO.

Sedima arose from an action filed in the Eastern District of New York by a Belgian corporation, based on § 1964(c) and (d) and predicate acts of mail fraud and wire fraud, charging that Imrex, Sedima's partner in a joint venture, had presented inflated bills and had cheated Sedima out of a portion of its proceeds by collecting for nonexistent expenses. The district court dismissed the RICO counts for failure to state a claim, holding that a RICO-type injury must be based on allegations of some sort of distinct "racketeering injury" or "competitive injury." 574 F.Supp. 963, 965 (1983). The dismissal was affirmed by a divided panel of the Second Circuit Court of Appeals. 741 F.2d 482 (1984). The court of appeals clarified

the type of injury which it required to be alleged, finding that "it is better to identify the RICO standing requirement as a 'racketeering injury' requirement rather than a 'competitive injury' requirement . . .." Id. at 496. The court of appeals further required that, before a private civil RICO action could be brought, the plaintiff must show that the defendants had been criminally convicted of the predicate acts. Id. at 503. The Supreme Court rejected both of these holdings.

Justice White, writing for the majority in Sedima, stated "we can find no support in the statute's history, its language, or considerations of policy for a requirement that a private treble-damages action under § 1964(c) can proceed only against a defendant who has already been criminally convicted." 473 U.S. at 493. Concerning the requirement of racketeering injury, Justice White stated that

> [W]e perceive no distinct "racketeering injury" requirement. Given that "racketeering activity" consists of no more and no less than commission of a predicate act, § 1961(1), we are initially doubtful about a requirement of a "racketeering injury" separate from the harm from the predicate acts. A reading of the statute belies any such requirement. . . . If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions [§ 1962(a)-(c)], and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement.

Id. at 495.

Justice White based this less restrictive reading of the statute on prior case law and the general principles surrounding the statute: "RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" Id. at 497-98 (citations omitted).

The Court recognized that this interpretation of the statute would permit its use not only against mobsters and organized criminals but also against "respected and legitimate 'enterprises.'" Id. at 499. Nevertheless, the Court found that Congress "wanted to reach both 'legitimate' and 'illegitimate' enterprises. "The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences." Id. (citation omitted). The Court concluded:

> It is true that private civil actions under the statute are being brought almost solely against such defendants, rather than against the archetypal, intimidating mobster. Yet this defect--if defect it is--is inherent in the statute as written, and its correction must lie with Congress. It is not for the judiciary to eliminate the private action in situations where Congress has provided it simply because plaintiffs are not taking advantage of it in its more difficult applications.

Id. at 499-500 (footnote omitted).

Justice White then suggested that Congress and the courts develop a meaningful concept of "pattern" in order to narrow the scope of civil RICO:

> The "extraordinary" uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of "pattern."

Id. at 500.

Despite this invitation from the Court, Congress to date has not chosen to enact legislation which would narrow the scope of civil RICO or to define more exactly what is "pattern." Moreover, the efforts of the courts to do so have not been entirely successful. Our attempts to design a meaningful concept of pattern have continued to collide with the broad language of the statute. In response, however, to Sedima, the various circuits began to structure guidelines for determining whether a RICO pattern had been established. In the Third Circuit, for instance, in Barticheck v. Fidelity Union Bank/First Nat'l State, 832 F.2d 36 (3d Cir. 1987), we rejected the district court's requirement in that case that there be two or more unlawful schemes, and we then set forth six factors to be used in determining whether a pattern of racketeering activity has been established in a given case. These factors are: (1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of

victims; (5) the number of perpetrators; and (6) the character of the unlawful activity.  Id. at 39.

Other circuits established other criteria.  In the Eighth Circuit, the test for a pattern of racketeering activity was much more restrictive:  proof of multiple illegal schemes was required.  See, e.g., Superior Oil Co. v. Fulmer, 785 F.2d 252 (8th Cir. 1986).  Following this precedent, the Eighth Circuit Court of Appeals affirmed the district's court's dismissal of petitioners' complaint in H.J. Inc. v. Northwestern Bell Tel. Co., 829 F.2d 648 (8th Cir. 1987).  The Supreme Court granted certiorari to resolve the conflict between the circuits over whether single or multiple schemes were required to demonstrate a RICO pattern.

In its opinion in H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989), the Court set out its second analysis of the requirements of civil RICO.  First, as to single versus multiple schemes, the Court noted that the word "scheme" is not found in the RICO statute and indeed that what constitutes a "scheme" is to be found "in the eye of the beholder, since whether a scheme exists depends on the level of generality at which criminal activity is viewed."  492 U.S. at 241 and n.3. The Court then examined the statute and its legislative history in an attempt to determine the elements of the pattern requirement.  From this review, the Court concluded that "to prove a pattern of racketeering activity a plaintiff must show

that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  Id. at 239.

Under the first, or "relatedness," requirement of the RICO statute, as interpreted in H.J. Inc., predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  Id. at 240 (quoting the partially repealed Title X of the Organized Crime Control Act of 1970, 18 U.S.C. § 3575, et seq.).[16]

As for the second, or "continuity," prong of the analysis, the  Court in H.J. Inc. attempted to promulgate a somewhat flexible approach, based upon a "commonsense, everyday understanding of RICO's language and Congress' gloss on it."  Id. at 241.  With this analytical approach in mind, the Court decided that "[w]hat a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, simpliciter."  Id.

In explicating how a plaintiff could make this continuity showing, the Court described continuity as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  Id.  "It

_____

[16]The parties do not dispute that the relatedness prong has been met in the present case.

is, in either case, centrally a temporal concept," id. at 241-42, so that a party may establish continuity as a closed-ended concept by "proving a series of related predicates extending over a substantial period of time." Id. at 242 (emphasis added).

Thus, H.J. Inc. makes clear that the continuity requirement can be met by establishing long-term criminal conduct but does not define what length of time qualifies as "substantial" for this purpose. The Court in H.J. Inc. also gave examples of how the threat of continued racketeering activity might be demonstrated. One example is that of a hoodlum who sells "insurance" to storekeepers to prevent the breaking of their shop windows. Id. Another example is that of an ongoing entity which commits the predicate acts or offenses as its regular way of doing business. Id. In giving this last example, the Court noted that such a business may be either a criminal or a legitimate enterprise and concluded:

> The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

Id. at 243 (footnote omitted). The clear implication of this language is that the ambit of RICO may encompass a "legitimate" businessman who regularly conducts his business through illegitimate means, that is, who repeatedly defrauds those with whom he deals and in the process commits predicate acts, for

instance by using the postal service as a means of accomplishing his scheme.

The Court went on in H.J. Inc., at the urging of various amici, to consider, and to reject, a requirement that "a defendant's racketeering activities form a pattern only if they are characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator, that is, of an association dedicated to the repeated commission of criminal offenses." Id. at 243-44. The Court found that there was no textual support in the statute for such a requirement and that the statutory language did not support the limitation that racketeering acts be the work of an association or group rather than of an individual. Id. at 244.

These determinations in H.J. Inc., that the predicate acts may be the regular way in which a legitimate business operates and that the racketeering activities may form a pattern even though they are the acts of an individual rather than of a group or of an association, enforce the Court's holding in Sedima that RICO reaches both "legitimate" and "illegitimate" enterprises. The Court in H.J. Inc. also rejected the employment of a definitional device, such as "scheme," to delineate racketeering activity, when the device employed, like "scheme," may be manipulated to satisfy the necessary criterion. See id. at 241 and n.3.

Whatever view we may have of Congress's original intent in enacting the RICO statute, we feel constrained, in applying the statute today, to follow the directives given by the Court in Sedima and H.J. Inc.

Since H.J. Inc., this court has faced the question of continued racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for closed-ended continuity. See Hughes v. Consol–Pennsylvania Coal Co., 945 F.2d 594, 610–11 (3d Cir. 1991) (fraudulent conduct lasting twelve months does not establish closed–ended continuity); Hindes v. Castle, 937 F.2d 868, 875 (3d Cir. 1991) (eight month period of predicate acts without a threat of future criminal conduct does not satisfy continuity requirement); Kehr Packages v. Fidelcor, Inc., 926 F.2d 1406, 1413 (3d Cir. 1991) (same); Banks v. Wolk, 918 F.2d 418, 422–23 (3d Cir. 1990) (same); Marshall–Silver Constr. Co. v. Mendel, 894 F.2d 593 (3d Cir. 1990) (seven month single-victim, single-injury scheme does not satisfy continuity requirement).[17] In Hughes, we

---

[17]In Marshall–Silver, we considered whether Congress intended RICO to apply in the situation of an extended scheme which posed no "significant societal threat" beyond its extended duration. 894 F.2d at 597. Because the scheme there lasted only seven months and posed no threat of recurrence, we stated that we would not resolve the "societal threat" issue. In view, however, of the Court's refusal in Sedima and H.J. Inc. to require racketeering injury, or prior conviction of the predicate acts, or multiple schemes, or racketeering acts by an association or group rather than by an individual, we cannot conclude that, in order to satisfy the RICO continuity requirement, the Court would require the existence of a "societal threat," whatever exactly that may be, beyond the commission of the criminal predicate

distinguished cases in other circuits in which closed-ended continuity had been established, noting that those cases involved conduct lasting "<u>years</u>, sometimes over a decade." <u>Hughes</u>, 945 F.2d at 611.

In evaluating the present case in accord with this precedent, we will first consider whether closed-ended continuity has been established. At the outset, we note that in civil RICO complaints based on predicate acts of mail fraud

> the continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice. Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis.

---

acts. To the extent that <u>Marshall-Silver</u> can be read to hold otherwise, it is overruled.

Kehr Packages, 926 F.2d at 1414.[18]   Consequently, in determining

[18]Defendants' assertion that the mailings involved must themselves be relied upon by the victim of the fraud in order for a RICO claim to be established is inaccurate.  As this Court stated in Kehr Packages, "completely 'innocent' mailings can satisfy the mailing element."  926 F.2d at 1415 (citing Schmuck v. United States, 489 U.S. 705, 715 (1989)).  Indeed, mailings "designed to lull [fraud] victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place" have been found to constitute actionable mail fraud.  Kehr Packages, 926 F.2d at 1416 n.3 (quoting United States v. Lebovitz, 669 F.2d 894, 896 (3d Cir.), cert. denied, 456 U.S. 929 (1982)).

Additionally, the use of the mails need not be an essential element of the fraudulent scheme.  Rather, so long as the mailings are "incident to an essential part of the scheme," Pereira v. United States, 347 U.S. 1, 8 (1954), the mailing element is satisfied.  This principle is elucidated by a review of the facts in Schmuck v. United States, 489 U.S. 705 (1989). In that case, Wayne Schmuck was engaged in a fraudulent scheme in which he would purchase used cars, roll back their odometers, and sell the cars to retailers for a price higher than their actual worth.  After purchasing an automobile from Schmuck and selling it to a customer, the dealers, in order to complete the resale of each automobile, would submit a title application form to the Wisconsin Department of Transportation.  The mailing of these forms constituted the mailing element of Schmuck's indictment on 12 counts of mail fraud.  The Supreme Court found that those mailing were sufficient to sustain Schmuck's indictment on mail fraud charges, reasoning that

> Schmuck's scheme would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell the cars obtained from him.  These resales and Schmuck's relationship with the retail dealers naturally depended on the successful passage of title among the various parties.  Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.

Id. at 712.

whether or not continuity has been established in the present case, we must focus on the duration of the underlying scheme. Just as the mailings are an element of the federal offense of mail fraud, so too is the scheme or artifice to defraud. See 18 U.S.C. § 1341, set out in footnote 15 supra. Each time defendants misrepresented the business nature of an expense, made a questionable charge, or received compensation to which they were not entitled, they lessened the income available to the Estate. Plaintiffs have provided evidence that these activities, which implemented defendants' purported scheme to defraud the Estate, lasted more than three and a half years, from November 10, 1987, to July 1991. We conclude that a scheme lasting over three years extends over a "substantial" period of time and therefore constitutes the type of "long-term criminal conduct" that RICO was enacted to address. See United States v. Pelullo, 964 F.2d 193, 209 (3d Cir. 1992) (holding that a jury could find a nineteen month period of racketeering activity sufficient to

---

In the instant case, it is clear that the mailings were incident to an essential part of the scheme. Had the defendants failed to mail disbursement checks to plaintiffs, plaintiffs would have immediately been alerted to defendants' alleged scheme. Consequently, by virtue of the disbursements mailed to plaintiffs, defendants were allegedly able to delay discovery of their scheme to misappropriate an excessive share of the partnership's profits. The scheme could not have continued unless the checks were delivered by one means or another. As long as the method of delivery was through the United States Postal Service, defendants' alleged scheme satisfied the elements of the federal offense of mail fraud.

satisfy continuity requirement); Swistock v. Jones, 884 F.2d 755, 759 (3d Cir. 1989) (fourteen month period of conduct may be sufficient to establish closed-ended continuity). Accordingly, we find, from the strictly durational aspect of the scheme, that plaintiffs in the present case have made a sufficient showing to survive summary judgment on the "continuity" prong of the pattern analysis.

The Supreme Court cautions us, however, in H.J. Inc., that the existence of continuity may not always be apparent. 492 U.S. at 243. For example, the statutory definition of pattern is "at least two acts of racketeering activity" within a ten year period. 18 U.S.C. § 1961(5). It is clear that ten years is a period of long duration. Yet, would two related predicate acts, one committed in February 1982 and one committed in January 1992, be sufficient to form a pattern? It would seem unlikely. Indeed, Justice White noted in a footnote that, while § 1961(5) defines a pattern of racketeering activity as requiring at least two acts of racketeering activity, two acts may not be sufficient. Id. at 496 n.14.

The question remains, then, what more is required in order to evaluate whether continuity has been established when predicate acts have occurred over a period of several years. One helpful consideration can be found in the Court's requirements for open-ended continuity. In H.J. Inc. the Court states that open-ended continuity is established when the commission of the

predicate acts is "a regular way of conducting defendant's ongoing legitimate business." 492 U.S. at 243. It would seem a valid analogy that, if the predicate acts have been a regular way of conducting defendant's legitimate business over a long period in the past, the RICO pattern has been satisfied.[19] In such a case, the relatedness and the frequency of the predicate acts would have created the pattern of racketeering activity. From our review of the record in the present case, we find that the allegations made by plaintiffs concerning defendants' manner of doing business over this period satisfy such a RICO continuity requirement.[20]

---

[19]In making this analogy, we in no way imply that the predicate acts <u>must</u> constitute a "regular way" of a defendant's doing business. We merely give one example of the manner in which "pattern" may be demonstrated.

[20]The district court, in granting summary judgment to defendants, found that "[t]his is not a case where the predicate acts are 'part of an entity's regular way of doing business,' such as would affect others doing business with the entity." App. at 1377. (citing <u>H.J. Inc.</u>, 492 U.S. at 242). <u>See</u> <u>supra</u> at page ___ [typescript at 16].
    To the extent that the district court suggests that effects upon others <u>doing business with</u> the entity are relevant to a finding of "continuity," we are not certain if the district court is requiring that those affected be outsiders doing business with the entity, as opposed to investors or partners in or beneficiaries of the entity. If so, we find no support in <u>H.J. Inc.</u> for such a requirement. The implication of the cited passage in <u>H.J. Inc.</u> does not limit its holding to require that the effect be on those who are doing business <u>with</u> the entity.
    If, on the other hand, the district court was making a finding of fact on the scope of the defendants' regular way of doing business, <u>i.e.</u>, that the alleged scheme to defraud the Estate and its beneficiaries, through the repeated actions described by Price Waterhouse, did not constitute defendants' regular way of doing business, then in view of the facts of

Moreover, even if we were not to have found that conduct lasting three and one-half years was sufficient to establish closed-ended continuity, we conclude that continuity still would have been established for the purposes of summary judgment in the present case under an "open-ended" continuity analysis.  Under H.J. Inc., if a RICO action is brought before a plaintiff can establish long-term criminal conduct, the "continuity" prong may still be met if a plaintiff can prove a threat of continued racketeering activity.  Whether the predicate acts constitute a threat of continued racketeering activity depends on "the specific facts of each case," id. at 242, but H.J. Inc. suggests that open-ended continuity may be satisfied "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business . . . or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'"  Id. at 243.

Mindful that Kehr Packages instructs us, in determining continuity, to focus on the mail fraud element of the underlying fraudulent activity as well as on the element of the mailings, we are persuaded that the evidence here meets the standard for open-ended continuity.  Plaintiffs have presented evidence that defendants continuously took questionable expenses, which directly affected the partnership income available to the Estate.

record, we must conclude that such a finding of fact is clearly erroneous.

Both Price Waterhouse reports are replete with examples of expense charges taken by defendants for which there is not adequate documentation or explanation to substantiate an ordinary and necessary business purpose. These included trips, meals, home services, cars, gasoline, insurance expenditures, and telephone bills.

At this stage of the litigation, we must view the facts in the light most favorable to plaintiffs, the non-movants, i.e., that as a regular way of doing business, defendants were fraudulently misrepresenting expenditures to benefit themselves and to deprive the Estate and its beneficiaries of their legitimate share of the profits of Tabas Enterprises. The evidence in the record is clear that these practices, defendants' regular way of doing business, continued even after plaintiffs' complaint was filed. As a consequence, plaintiffs have established a threat of continuing fraudulent conduct as required under an "open-ended" continuity analysis.

Because we have found a pattern of racketeering activity in both the duration of and the on-going threat implicit in defendants' regular way of doing business, we will not go on to analyze this case under the six Barticheck factors. The fact that we do not employ the Barticheck factors in our analysis here does not, however, mean that they might not be relevant in a different case in determining if continuity exists. As the Court noted in H.J. Inc., in those cases where relatedness and

continuity are in doubt, other factors should be examined to discern if there is a "pattern of racketeering activity" under RICO:

> The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a "pattern of racketeering activity" exists.

492 U.S. at 243. It is helpful, therefore, when determining whether "relatedness" or "continuity" has been proven, to use a fact-oriented, case-by-case approach to determine whether there is a "pattern of racketeering activity."[21]

---

[21]Although we decided Barticheck before H.J. Inc., we have since noted that the six Barticheck factors are still relevant in determining whether a pattern exists. See Hindes v. Castle, 937 F.2d 868, 873 n.3 (3d Cir. 1991) ("[T]he Barticheck factors, such as the number of acts, victims, and perpetrators and the character of the unlawful activity, may be relevant in some cases in assessing the threat of continuing criminal conduct by throwing light on whether the illegal activity was part of a legitimate business' regular way of conducting business, or whether the predicates were attributable to a 'long-term association that exists for criminal purposes.'") (citation omitted).

It remains clear, however, that "duration is the sine qua non of continuity." Hindes, 937 F.2d at 873. For this reason, the Barticheck factors are best viewed as analytical tools available to courts when the issue of continuity cannot be clearly determined under either a closed- or open-ended analysis.

It should also be noted that the H.J. Inc. decision cites the Third Circuit's holding in Barticheck for two narrow propositions only: (1) that continuity is both a closed- and open-ended concept, 492 U.S. at 238, and (2) that "scheme" is not a self-defining term, 492 U.S. at 241 n.3. Nowhere in H.J. Inc. does the Supreme Court expressly adopt the Barticheck factors as being required elements in the "continuity" analysis.

In the present case, we find that plaintiffs have clearly presented evidence that is legally sufficient to survive summary judgment on the issue of continuity through the defendants' alleged commission of the predicate acts and of the underlying fraudulent activity as an ongoing way of doing business. Accordingly, we do not need to concern ourselves with the applicability of the Barticheck factors to the specific facts of this case.

We recognize that our ruling means that RICO, with its severe penalties, may be applicable to many "garden-variety" fraud cases, see Marshall-Silver, 894 F.2d at 597, particularly considering the judiciary's broad interpretation of the mail fraud statute. See Kehr Packages, 926 F.2d at 1413-14. We are bound, however, by the language of RICO itself and the Supreme Court's instruction that "RICO is to be read broadly." Sedima, 473 U.S. at 497. Indeed, the Supreme Court has consistently struck down efforts by the courts of appeals to narrow RICO's scope. See NOW v. Scheidler, 114 S. Ct. 798, 806 (1994) (rejecting Seventh Circuit holding that RICO requires proof that either the racketeering enterprise or the predicate acts of racketeering were motivated by an economic purpose); H.J. Inc., 492 U.S. at 250 (rejecting Eighth Circuit holding that RICO requires proof of multiple "schemes"); Sedima, 473 U.S. at 495 (rejecting Second Circuit holding that RICO requires proof of

prior conviction on predicate act and that plaintiff must demonstrate specific "racketeering injury").

We share the Supreme Court's concern over the broad application of the civil RICO statute. We are nonetheless bound by the language of the statute and the Supreme Court's interpretation of it. Accordingly, it is for Congress to decide whether to narrow the scope of RICO; we are not in a position to do so by requiring that parties prove elements of a threat or of an injury, presented by predicate racketeering activity, beyond what is expressed in the language of the statute itself.[22]

V.

Defendants have raised a number of alternative grounds for summary judgment claiming that insufficient causation and injury have been pleaded and that some of the defendants are not

---

[22]The dissent relies upon our recent holding in Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250 (3d Cir. 1994) for the proposition that civil RICO should not be applicable in cases lacking a significant societal threat. But see footnote 17 in regard to our position that there is no requirement in civil RICO that the predicate acts pose a "societal threat." We find several significant differences, however, between Jordan and the dispute here. First, the duration and continuing nature of the underlying fraudulent activity alleged here is much greater. In addition, the district court in Jordan questioned the "relatedness" of the predicate acts, see Jordan v. Berman, 792 F. Supp. 380, 385-86 (E.D. Pa. 1992), and further held that plaintiffs had failed to establish that they had sustained any injury from the purported predicate acts. Id. at 388. Finally, and perhaps most importantly, the district court in Jordan found that there was no evidence presented that would lead a jury to believe that mail fraud had been committed. Id. at 387. As discussed above, we have come to a different conclusion in the present dispute.

potentially liable under RICO.  Because discovery has not been completed, we find that it would be premature to address these alternative grounds.  Plaintiffs have sought to take additional depositions that could have substantial bearing upon these issues.  Additionally, the district court did not rule on any of the alternative grounds, and, as a consequence, it would be inappropriate for us to consider them at this stage.[23]

VI.

For the foregoing reasons, we will reverse the district court's decision granting summary judgment against plaintiffs on their RICO claims, we will vacate the dismissal of plaintiffs' supplemental state claim, and we will remand this case to the district court for further proceedings consistent with this opinion.[24]

BECKER, <u>Circuit Judge, Concurring</u>.

I

I join in almost all of Judge Roth's lead opinion (including Parts I, II, V, and VI in their entirety), and I

---

[23]We note that on remand the court should consider whether the decision in <u>Reves v. Ernst & Young</u>, 113 S. Ct. 1163 (1993) has any bearing on this case.  In <u>Reves</u>, the Supreme Court held that only defendants who participate in the operation or management of an enterprise can be held liable for violating 18 U.S.C. § 1962(c).

[24]In view of our vacatur of the dismissal of plaintiffs' supplemental state claims, we do not need to rule on defendants' cross-appeal.

concur in the judgment.  I write separately, however, because I believe that the opinion has "stopped short," and not carried the logic of its argument to its ultimate conclusion.  More specifically, while Judge Roth's opinion makes clear that the "Barticheck factors" cannot be the sine qua non of the continuity determination, and its opinion undoubtedly erodes Barticheck's precedential value, the court's logic -- as Judge Greenberg's dissent recognizes, see Dissenting Op. at page 7, especially lines 6-10 -- compels the conclusion that Barticheck should be abandoned.  Yet Judge Roth leaves it breathing and thereby will, I fear, cause mischief by engendering confusion in the district courts, in addition to a round of further appeals.

I recognize that Judge Roth's opinion does not in terms rest on application of the six Barticheck factors.  It is a fact, however, that these factors have been at the heart of this court's civil RICO jurisprudence for the past seven years, and most district court opinions struggling with the existence vel non of civil RICO continuity use Barticheck as their polestar. In my view, now that we are in banc on a civil RICO case, it is incumbent upon us to clarify the status of Barticheck, and the lead opinion's avoidance of the issue is not grounds for putting it off to another day.  I therefore write separately in order to set forth my understanding of the implications of this court's decision.

II

Perhaps the most serious example of the uncertainty needlessly sown by the jurisprudential reticence of Judge Roth's opinion concerns Barticheck factor #6, the "character of the unlawful activity." In my view, the opinion can be read as leaving open the possibility that this factor, along with the other Barticheck factors, survives today's decision. See Lead Op. at page 40 ("The fact that we do not employ the Barticheck factors in our analysis here does not, however, mean that they might not be relevant in a different case in determining if continuity exists.") (emphasis supplied); id. at 41 n.21 ("The Barticheck factors . . . may be relevant in some cases in assessing the threat of continuing criminal conduct . . . .") (internal quotation marks omitted, emphases supplied). This is apparently the conclusion drawn by Judge Greenberg, whose dissent treats "character of the unlawful activity" as the most important of the factors. See Dissenting Op. at pages 12, 15. But Judge Roth's opinion does not explain how to distinguish this factor from "societal threat," which, she properly holds (if less emphatically than is warranted), cannot survive Sedima and H.J., Inc. See Lead Op. at page 34 n.17.

This reluctance to overrule Barticheck thus has the unfortunate potential for contributing to doctrinal confusion, for as Judge Greenberg argues in dissent, see Dissenting Op. at page 7, a given factor either is or is not relevant to the

existence of a "pattern" of racketeering activity. The RICO statute does not have one provision for cases where relatedness and continuity (or their absence) are clear and another for "those cases where relatedness and continuity are in doubt." Lead Op. at page 40. Accordingly, I believe that we should inter Barticheck as a whole, and should forthrightly announce which, if any, Barticheck factors remain relevant to the continuity analysis and which do not.

## A.

As I read Judge Roth's opinion, it properly treats the length of time over which the predicate acts were committed (Barticheck factor #2), the number of unlawful acts (factor #1), and the routineness or customariness of the acts (which in my view is, as I explain below, the only permissible interpretation of factor #6, the character of the unlawful activity) as relevant for the continuity inquiry. Although Judge Roth does not discuss Barticheck factors #3-#5 (similarity of acts, number of victims, and number of perpetrators), I believe that its analysis shows that these factors are irrelevant to the continuity inquiry.

As Judge Roth notes, continuity is "centrally a temporal concept." Lead Op. at page 31 (quoting H.J., Inc., 492 U.S. at 242). It simply "refer[s] either to a closed period of repeated conduct [closed-ended continuity], or to past conduct that by its nature projects into the future with a threat of repetition [open-ended continuity]." Id. (quoting H.J., Inc.,

492 U.S. at 241) (alterations supplied here). Thus duration, whether established duration or likely duration, is central to the "continuity" aspect of a RICO "pattern." As a result, the length of time over which the predicate acts occurred (Barticheck factor #2) is of primary significance.

I agree with Judge Roth's view that something more is needed to make out a "pattern," and that two related predicate acts almost ten years apart are unlikely to suffice. See Lead Op. at page 37. But the number of predicate acts (Barticheck factor #1), on which her opinion properly relies in finding continuity here, provides all that is needed for closed-ended continuity. In conjunction with duration, the number of acts suffices to show frequency -- a concept that, as Judge Roth's opinion agrees, see Lead Op. at 6, provides an adequate interpretation of "pattern" where completed, related acts are concerned.

As the Supreme Court has explained, the definition of a RICO "pattern" should accord with the plain meaning of that term. In particular,

> [a] "pattern" is an "arrangement or order of things or activity," and the mere fact that there are a number of predicates is no guarantee that they fall into any arrangement or order. It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them "ordered" or "arranged."

H.J., Inc., 492 U.S. at 238, 109 S. Ct. at 2900 (citation omitted).

As I see it, the continuity prong of pattern analysis should be explicitly directed toward ruling out RICO liability premised on two or more predicate acts that are related but nonetheless "isolated" or "sporadic."  See H.J., Inc., 492 U.S. at 239, 109 S. Ct. at 2900 (discussing legislative history of the "pattern" requirement).  Courts then would be in a better position to engage in reasonably meaningful discussions of whether -- in the concrete circumstances of the case -- continuing racketeering activity had been adequately alleged.

But the Barticheck factors fail to provide the needed guidance, and any attempt to use all six in continuity analysis, in my view, is destined for failure, in part because these factors were not originally intended to govern the continuity inquiry.  Rather, they originated as an attempt to distill our case law on the RICO pattern requirement, simpliciter, not as an explication of separate relatedness and continuity requirements. See Barticheck, 832 F.2d at 38-39 ("Those cases . . . recognized that the existence of a RICO pattern . . . turn[s] on . . . " a combination of specific factors . . . .") (emphasis supplied). Some of the Barticheck factors are relevant to this general notion of pattern.[25]  Once "pattern" is analytically severed into "relatedness" and "continuity," however, there is no reason to

_____

[25] I do not mean to suggest that the number of perpetrators or victims, while irrelevant to continuity, is relevant to relatedness, for it is not.  The identity or other defining characteristics of the victims and perpetrators, however, may help establish relatedness of predicate acts.

insist that all six of the factors will logically bear on both continuity and relatedness. Barticheck did not do so. Rather, it discussed the various factors and concluded simply that the plaintiffs had adequately alleged a RICO pattern. See id. at 39.

What Barticheck did do, however, was recognize that continuity might be either open-ended or closed-ended, rejecting the defendants' argument that RICO reached only conduct that was potentially ongoing. See id. at 39-40. Furthermore -- and this accords with my view that the factors should be analyzed as they bear on screening out isolated or sporadic activity -- the Barticheck panel said that the "continuity" language in the legislative history cited in Sedima

> simply call[ed] for an inquiry into the extent of the racketeering activity. Although temporal open-endedness may be one measure of extent, it is not the only one. We decline to adopt a verbal formula for determining when unlawful activity is sufficiently extensive to be "continuous."

832 F.2d at 40. I would explicitly hold, therefore, that although the duration of the predicate acts does not without more show continuity, if the acts occurred (as shown by the number of acts) or establish a threat of occurring (as shown by also considering whether they are repetitive in nature) with some frequency, they satisfy the continuity requirement, and, provided they are related, a pattern is shown.

"A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." H.J.,

Inc., 492 U.S. at 242, 109 S. Ct. at 2902. What constitutes a "substantial" period of time for these purposes (as long as in excess of "a _few_ weeks or months," see infra) should vary with the number of acts in "the _series_" of predicates. As the number of acts in a given period of time increases, the predicates begin to look less sporadic and a pattern begins to emerge. The only (relative) absolute here should be that the predicates must stretch out at least for more than three or four months to establish closed-ended continuity in light of the Court's instruction that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy" the continuity requirement. Id. at 242, 109 S. Ct. at 2902.

For open-ended continuity, in contrast, we are looking for "conduct that by its nature projects into the future with a threat of repetition." Thus, while I agree with Judge Roth that the two types of continuity are cognate, I believe that to see whether open-ended continuity is established, what we should ask is simply whether the activity threatens to demonstrate close-ended continuity at some future time. This, I believe, is the point of the three examples of open-ended continuity in the H.J., Inc. opinion, including the scenario where the defendant's commission of predicate acts is "a regular way of conducting defendant's ongoing legitimate business." 492 U.S. at 242-43, 109 S. Ct. at 2902.

To return to Barticheck factor #6, in my view, threat of recurrence is also the only respect in which the "character" of the predicate acts is relevant to the continuity inquiry. As the Supreme Court and Judge Roth's opinion have explained, open-ended continuity merely refers to "past conduct that by its nature projects into the future with a threat of repetition." Majority Op. at page 31 (quoting H.J., Inc., 492 U.S. at 241, 109 S. Ct. at 2902) (emphasis supplied here). For example, if extortion is a defendant's regular way of conducting business, then the nature or character of the conduct in the sense of its routineness or literal open-endedness makes it likely to continue into the future. That is the sense in which the character of the activity is relevant to continuity.[26]

As Judge Roth's opinion correctly holds, "character of the unlawful activity" may not refer to some notion of "societal threat." Lead Op. at page 34 n.17. Because the opinion does not clarify the extremely limited sense in which "character" of the

---

[26]This interpretation of "character" of the unlawful activity as "repetitive character" also makes sense of the admonition in Kehr Packages to consider the underlying scheme in mail fraud cases. To the extent that the underlying scheme indicates a likelihood of a defendant's continuing to commit predicate acts, it may be relevant to open-ended continuity. (Of course, the underlying scheme also may supply an "organizing principle" that establishes relatedness. See supra at page 50 (quoting H.J., Inc. 492 U.S. at 238, 109 S. Ct. at 2900).) In all cases, however, we are looking for a pattern (and thus continuity and relatedness) of the predicate acts of racketeering activity, see H.J., Inc., 492 U.S. at 237-40, 109 S. Ct. at 2900-01; id. at 242, 109 S. Ct. at 2902.

predicate acts is relevant to the continuity inquiry, the dissent unfortunately devotes great energy to arguing that the "character" of the predicate acts, meaning the species of act involved, weighs against a finding of continuity. See Dissenting Op. at pages 12-18. I believe that this effort is fundamentally at odds with the RICO statute and Supreme Court precedent interpreting it.

B.

The "societal threat" requirement can be traced back to this court's opinion in the first Marshall-Silver case, 835 F.2d 63 (3d Cir. 1987). There, we reasoned that "the target of RICO . . . is criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a significant period of time." Id. at 66-67 (emphases supplied). The panel dismissed the case in part because it involved "a single victim, a single injury, and a single short-lived scheme with only two active perpetrators," id. at 67, and thus did not pose the appropriate sort of threat. This was an eminently prudent attempt to make sense of the RICO pattern requirement. It appears to be an effort to get at the ongoing or potentially ongoing criminal activity that concerned Congress. It was essentially an extent requirement.

In the cases after H.J., Inc., however, the concern over extent of injury was transmogrified to a focus on societal

injury. Rather than worry about a "series of injuries," we have come to focus on a normative evaluation of the injuries alleged in a civil RICO case. Such focus is the basis for Judge Greenberg's dissent in this case, but with all due respect, given what Congress and the Supreme Court have said about the RICO statute, see Lead Op. at page 34 n.17, I believe that the focus is inappropriate in this context.

Congress in the RICO statute specified an extensive laundry list of serious and arguably less serious acts that all constitute racketeering activity, and so it strikes me as improper to maintain that the statute's "pattern" requirement builds in a normative evaluation of the seriousness of the predicate acts. The concern about federalizing and attaching drastic penalties to "garden variety fraud," see Dissenting Op. at pages 20-21, is a legitimate one, but one that must be addressed by Congress rather than the courts. And Congress has told us what sorts of acts to worry about. Our concern with the pattern requirement is simply to insure that RICO liability is not attached to "isolated" or "sporadic" predicate acts. That task requires no inquiry into the seriousness of the acts. The "threat" for which we are looking is the threat of repeated prohibited conduct, not the threat of grievous harm.

With this in mind, I believe that this court should plainly state that the number of victims (factor #4) and number of perpetrators (factor #5) do not bear on the continuity

inquiry. Certainly, neither the number of victims nor the number of perpetrators should affect the analysis of duration which, as the majority explains, the Supreme Court has rendered the centerpiece of the continuity jurisprudence. Indeed, these factors seem to inform the notion of societal threat, and hence are out of bounds.

Nor does the number of victims or perpetrators go to making out a pattern. For example, one office-tower bomb triggered during business hours could result in a tragically large number of victims, but just because the bombing happened during the day instead of at night when few people were there does not make it more likely that the bombing reflects non-isolated or non-sporadic activity. Similarly, three bombings by several conspirators trying to eliminate one target would not (if successful) reflect a greater threat of continuing racketeering activity than would three bombings by the Unabomber, because it is only the repetitive nature of the activity and not the number of victims or perpetrators that helps establish a threat of continuity.

The number of predicate acts could indicate an extent of activity that would bear on whether the activity is sporadic or frequent, and extent of the predicate activity is therefore relevant to continuity, as Judge Roth seems to recognize. See Lead Op. at page 38 ("[If] the predicate acts have been a regular way of conducting defendant's legitimate business over a long

period in the past, the RICO pattern been satisfied."). But number of victims is not relevant, for, under the present congressional scheme, we are looking for continuity in order to show a pattern of racketeering acts, not harm from the acts. See supra page 54 n.26.

## C.

We have previously held that "similarity" (factor #3) does not bear on continuity, see, e.g., Marshall-Silver, 894 F.2d at 595 n.1, and Judge Roth has already made length of time (factor #2) and number of unlawful acts (factor #1) part of her core analysis, irrespective of Barticheck. In my view, the lead opinion leaves virtually nothing of Barticheck and I believe -- along with Judge Greenberg in dissent, see Dissenting Op. at page 7, especially lines 6-10 -- that we should say so. While I share Judge Roth's uneasiness as to where this leaves the law, I can only hope that its eloquent and clarion call will not be ignored by Congress.

Judges Stapleton and McKee join in this concurrence.


ALITO, Circuit Judge, concurring:

I concur in the judgment, and I join parts I, II, V, and VI of the opinion of the court  While the discussion of the "continuity" requirement in part IV of Judge Roth's opinion is a welcome step away from the approach taken in some of this court's prior decisions, I do not agree with certain portions of that

discussion.    I set out my understanding of the concept of "continuity" in Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1419-26 (3d Cir. 1991) (Alito, J., concurring and dissenting), and pursuant to that analysis, I think that closed-ended continuity was sufficiently established here to defeat summary judgment.    My principal points of disagreement with the discussion in part IV of Judge Roth's opinion are as follows.

First, I do not agree with the intimation (Typescript at 34) that closed-ended continuity requires activity lasting years.    See Kehr Packages, Inc., 926 F.2d at 1421-22 (Alito, J., concurring and dissenting).

Second, I do not agree with the suggestion (Typescript at 36-37) that a plaintiff who establishes "closed-ended continuity" may also be required to show that the predicate acts were part of the defendant's regular way of conducting its business.    I see no support for this requirement in the language of the RICO statute or relevant Supreme Court decisions.

Third, I do not agree that, in a RICO case based on mail fraud predicates, we must "focus on the underlying fraudulent activity, rather that on the otherwise innocent mailings, in determining continuity." (Typescript at 38.)    In my view, we must focus on the duration of the predicate violations.    See Kehr Packages, Inc., 926 F.2d at 1422-23 (Alito, J., concurring and dissenting).

Finally, I do not think that the Barticheck factors should be considered except to the extent that they have some logical bearing on "relatedness" or "continuity." See Kehr Packages, 926 F.2d at 1421 (Alito, J., concurring and dissenting).

GREENBERG, Circuit Judge, dissenting.

In its amended complaint, the Estate of Charles L. Tabas seeks to transform its state-law dispute with the defendants over the proper allocation of a partnership's profits into a federal RICO case simply by alleging that the defendants used the United States mail to communicate with it over a substantial period of time. While we have not considered directly whether a plaintiff can bring a RICO action in such circumstances, our precedents clearly forbid such alchemy. See Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 609-11 (3d Cir. 1991), cert. denied, 501 U.S. 1222, 112 S.Ct. 2300 (1992); Hindes v. Castle, 937 F.2d 868 (3d Cir. 1991); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406 (3d Cir.), cert. denied, 111 S.Ct. 2839 (1991); Banks v. Wolk, 918 F.2d 418 (3d Cir. 1990); Marshall-Silver Constr. Co. v. Mendel, 894 F.2d 593 (3d Cir. 1990); Swistock v. Jones, 884 F.2d 755 (3d Cir. 1989). Therefore, I would affirm the grant of summary judgment in favor of the defendants, and I respectfully dissent.[27]

I agree with the majority that the central issue in this appeal is whether the Estate has alleged that the defendants engaged in a "pattern of racketeering activity" as defined in 18

---

[27]The Estate may have valid claims under state law, but I would hold that the district court did not abuse its discretion in dismissing these claims pursuant to 28 U.S.C. § 1367.

U.S.C. § 1961(5).[28] Majority typescript at 24. As noted by the majority, to establish a pattern of racketeering activity, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 2900 (1989) (emphasis in original). Thus, a plaintiff seeking to bring a RICO claim must allege, among other things, relatedness and continuity.

As the majority states, the predicate acts are 41 instances of alleged mail fraud. Of these, 39 were the mailing of $15,000 checks to the Estate, totalling $585,000, representing monthly distributions from Tabas Enterprises. The remaining two were the mailing of yearly tax forms to the Estate. Amended Complaint ¶ 49, App. at 43-46. According to the amended complaint, the checks were sent from December 22, 1987, to February 19, 1991, a period of over three years.[29] The Estate also alleges as predicate acts that the defendants used the United States mail to send checks to members of Daniel Tabas's family for work not performed. Amended Complaint ¶ 51, App. at

---

[28]I also agree with the majority that the 1987 settlement and the subsequent mutual release do not preclude the Estate from bringing this case. I mention this point because, as the majority notes, this issue was considered by the panel only and I was a member of the panel.

[29]The amended complaint recites that the last two checks were sent on January 18, 1990, and February 19, 1990. Amended Complaint at 34. However, these dates appear to be typographical errors because they are listed in an otherwise chronological sequence in which the next preceding date was December 14, 1990.

46–47.[30]  The majority, however, does not rely on these allegations as the Estate did not provide evidence that these checks were mailed, and the evidence on the motion for summary judgment established that a courier delivered them.  I agree with this disposition and thus conclude that we are concerned only with the mailing of the $15,000 checks and the tax forms.

I would hold that these mailings are related.[31]  See Kehr Packages, 926 F.2d at 1414 (noting that relatedness test almost always will be satisfied "in cases alleging at least two acts of mail fraud stemming from the same fraudulent transaction").  However, in my view these mailings do not satisfy the continuity requirement as defined by the Supreme Court's and our precedents.  In H.J. Inc., the Supreme Court stated that continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  492 U.S. at 241, 109 S.Ct. at 2902 (citing Barticheck v. Fidelity Union Bank/First Nat'l State, 832 F.2d 36,

---

[30]In their brief, the defendants maintain that this allegation does not satisfy the pleading requirements of Fed. R. Civ. P. 9(b).  Brief at 30 n.6; see Banks v. Wolk, 918 F.2d at 422 n.1 (noting that allegations of mail fraud must be plead with specificity required by Fed. R. Civ. P. 9(b)).  I do not address this contention because even assuming that the pleading requirement is met, the allegations were refuted and, in any event, the Estate's allegations as a whole do not state a claim under RICO.

[31]While the majority does not hold explicitly that they are related, it implicitly reaches this conclusion.

39 (3d Cir. 1987)).  If a plaintiff does not allege that the predicate acts lasted over a "substantial period of time," then it must allege a threat of continued criminal activity.  Id. at 242, 109 S.Ct. at 2902; Marshall-Silver, 894 F.2d at 596. Conversely, if a plaintiff alleges that the predicate acts lasted a substantial period of time, then it need not allege a threat of future criminal conduct.  Therefore, a plaintiff alleging a closed-ended scheme has both a lesser burden in that it does not have to demonstrate a threat of future harm, and a greater burden in that it must establish that the predicate acts continued over a substantial period of time.

Although we do not have a bright-line rule establishing how long the predicate acts must last to constitute a "substantial period of time," I will assume that the period of over three years in this case would satisfy any such definition.[32]  Yet, simply by clearing this duration hurdle the Estate does not establish continuity for we have stated clearly and repeatedly that duration is a necessary but not sufficient condition to proving continuity.  In Hindes v. Castle, for example, we stated:

> The post-H.J. Inc. cases decided by this court which have focused on pattern all make clear that duration is the sine qua non of continuity.  While it is not in itself sufficient to establish a pattern, a determination that must be made in light of

---

[32]While I treat this case as a closed-ended case, obviously if I considered it as open-ended my result would be the same.

all of the Barticheck factors, no pattern can be shown without the required duration.

937 F.2d at 873 (emphasis added). Likewise, in Marshall-Silver we recognized:

[I]f the Court in H.J. Inc. intended that the duration of the predicate acts or the threat arising therefrom should be determinative . . . we would not have expected the Court to eschew providing a specific standard in favor of a fact oriented, case-by-case development.

894 F.2d at 597 (emphasis in original) (dicta); see also Kehr Packages, 926 F.2d at 1412 (noting that "the length of time over which the criminal activity occurs or threatens to occur is an important factor," but not stating that it is dispositive). Accordingly, a more detailed analysis of the complaint is required.[33]

---

[33]Our rule that duration is a necessary but not sufficient condition to establish continuity is consistent with the Supreme Court's statement in H.J. Inc.: "petitioners claim that the racketeering predicates occurred with some frequency over at least a 6-year period, which may be sufficient to satisfy the continuity requirement." 492 U.S. at 250, 109 S.Ct. at 2906 (emphasis added). By using the word "may," the Court implicitly rejected the notion that duration alone establishes continuity.

Precedents in other circuits could be read to suggest that duration alone can satisfy continuity. See, e.g., Dana Corp. v. Blue Cross & Blue Shield Mutual, 900 F.2d 882, 886-87 (6th Cir. 1990) (stating that in a single-scheme, single-victim case "the allegations of fraud occurring for a period of seventeen years, along with the specific mailings evidencing such a scheme, are sufficient to state a claim of a pattern of racketeering activity"); Fleet Credit Corp. v. Sion, 893 F.2d 441, 446-47 (1st Cir. 1990) (finding that 95 fraudulent mailings sent over a four and one-half year period are sufficient to establish continuity); Walk v. Baltimore & Ohio & R., 890 F.2d 688, 690 (4th Cir. 1989) (reversing dismissal where complaint alleged 10-year scheme to defraud plaintiffs); Jacobson v.

In *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, we set forth six factors that a court should address in considering whether the plaintiff has alleged a pattern of racketeering: (1) the number of unlawful acts; (2) the length of time over which the acts were committed (duration); (3) the similarity of the acts; (4) the number of the victims; (5) the number of perpetrators; and (6) the character of the unlawful activity. *Id.* at 39. The majority nevertheless concludes that having "found a pattern of racketeering activity in both the duration of and the on-going threat implicit in defendants' regular way of doing business [it] will not go on to analyze this case under the six *Barticheck* factors." Majority typescript at 40. The majority then indicates that its decision not to employ the *Barticheck* factors does not mean that they are irrelevant in determining where there is continuity, as a court may consider the factors if relatedness and continuity are in doubt.

---

*Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (stating that continuity existed because predicate acts alleged occurred over "a matter of years"). However, it is not clear that in any of these cases, the courts of appeals faced a factual situation analogous to the one presented here, *i.e.*, a dispute over the profits of a partnership. This case most similar to this one is *Jacobson*. In *Jacobson*, the plaintiff alleged that the two defendants, one of which was his son, attempted to defraud him out of real estate holdings that he owned. While the nature of the dispute is somewhat similar, the alleged predicate acts went beyond mail fraud and included extortion, larceny, offering false instruments for filing, and usury. 882 F.2d at 719. Thus, the character of the unlawful activity in *Jacobson* is vastly different than that alleged here. In any event, we are not bound by *Jacobson*.

I reject the majority's approach. To start with, continuity is in doubt here. But quite aside from that consideration it seems to me that the majority's approach inevitably leads to analytical looseness in determining whether there has been a pattern of racketeering activity. While I do not doubt that in practice the Barticheck factors cannot be applied with mathematical precision, at least the factors are guidelines in determining whether the plaintiff has demonstrated continuity and relatedness.

The majority opinion would be more justifiable if it were to say that after H.J., Inc., the earlier explicated Bartichek factors are no longer relevant in any continuity analysis. While I would disagree with that holding, such a result would have some analytical consistency. But by saying the Bartichek factors are relevant in some cases but not in others, see majority typescript at 40-41 & n.21, the majority winds up saying that the Bartichek factors -- which are designed to answer the broader question of whether particular facts fairly can be characterized as a RICO case -- may shed light on whether a three-month long scheme constitutes a pattern of racketeering activity but not on whether a three-year long scheme constitutes such a pattern. It seems to me self-evident that there are three-month long schemes that clearly fall within RICO's purview and three-year schemes that clearly do not. Thus, if the Bartichek factors are relevant at all, they are relevant in

shedding light on all cases. The majority's approach to the complex statute does injustice to the Supreme Court's admonitions to courts to take a "flexible approach" when interpreting the "continuity" prong of the statute and to develop the concepts behind "pattern of racketeering activity" on a case by case basis. See H.J. Inc., 492 U.S. at 238, 243, 109 S.Ct. at 2900, 2902-03. See also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 500, 105 S.Ct. 3275, 3287 (1985) (Congress "and the courts" should "develop a meaningful concept of 'pattern.'") (emphasis added).

Of course, as I have indicated, we decided Barticheck before the Supreme Court's decision in H.J. Inc. Nevertheless, we have noted in post-H.J. Inc. cases that the Barticheck factors are still relevant and must be considered "'as they bear upon the separate questions of continuity and relatedness.'" Hindes, 937 F.2d at 873 (quoting Banks, 918 F.2d at 423); accord Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1023-25 (7th Cir. 1992) (noting that factors set forth in Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir. 1986), which are similar to Barticheck factors, apply even after H.J. Inc.). In Marshall-Silver, we recognized that all of the Barticheck factors except the third, the similarity of criminal acts, are relevant to the question of continuity. 894 F.2d at 595 n.1; see also Hindes, 937 F.2d at 873 (reaffirming this view). Thus, the question of continuity is an "'inquiry into the extent of the [defendant's]

racketeering activity,'" Marshall-Silver, 894 F.2d at 595 (quoting Barticheck, 822 F.2d at 40), and requires an examination of the five Barticheck factors relevant to continuity. Moreover, in applying these factors, we must take a "natural and common sense approach" to continuity. H.J. Inc., 492 U.S. at 237, 109 S.Ct. at 2899. In view of these precedents in which so many of the judges of this court have joined, I am perplexed at the majority's subordination of Barticheck.

Inasmuch as I would apply Barticheck in this case I will now make an analysis of the factors it set forth. The first factor, the number of unlawful acts, might appear to weigh in favor of continuity as the Estate alleged that the defendants engaged in over 40 predicate acts. However, as we stated in Kehr Packages, "the continuity question should not be affected by the fact that a particular fraudulent scheme involved numerous otherwise 'innocent' mailings, rather than only a few." 926 F.2d at 1414. Rather, what needs to be considered is the underlying scheme: "Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis." Id.; see also Midwest Grinding Co., 976 F.2d at 1024 ("Although the sheer number of predicate acts might appear at first glance to prove continuity, when it comes to a pattern premised on acts of mail or wire fraud, the volume of mailings is not dispositive.").

In this case, the alleged underlying scheme was an attempt to defraud the Estate out of its rightful share of the partnership income.  Thus, the allegations of fraud relate to a discrete dispute, rather than to numerous distinct attempts to defraud.  To paraphrase Kehr Packages, "[i]t should not be relevant . . . that [the defendants] sent [checks] on a monthly basis, rather than quarterly or yearly."  926 F.2d at 1414.  Thus, "the sizable number of mailings does not show that the defendants operated a long-term criminal operation."  Midwest Grinding Co., 976 F.2d at 1025.  Accordingly, this factor weighs against a finding of continuity.

The second factor is duration.  As I noted above, the alleged fraudulent activity lasted for at least three years.  However, the significance of the length of the alleged scheme is diminished by the nature of the scheme itself.  In this regard, I reiterate that the defendants repeated the same allegedly fraudulent act over three years.  Thus, this is not a case in which each mailing constituted a new fraudulent act.  See Kehr Packages, 926 F.2d at 1415 (distinguishing Fleet Credit Corp. v. Sion, 893 F.2d 441 (lst Cir. 1990), because in Fleet Credit "each mailing constituted a new fraudulent act").  As we noted in Marshall-Silver:

> Where such a fraudulent scheme inflicts or
> threatens only a single injury, we continue
> to doubt that Congress intended to make the
> availability of treble damages and augmented
> criminal sanctions dependent solely on
> whether the fraudulent scheme is well enough

conceived to enjoy prompt success or requires pursuit for an extended period of time.

894 F.2d at 597. Therefore, while the second factor, duration, does weigh in favor of continuity, it is not a heavy weight on the scale. I will not discuss the third factor, the similarity of the alleged criminal acts, as that factor concerns relatedness, which I have found in this case.

The fourth factor, number of victims, weighs against a finding of continuity for, as the district court correctly indicated, this is a single-victim case. The Estate disputes this conclusion, contending that all six of the beneficiaries of the Estate are victims, including a charitable foundation that ultimately benefits hundreds, if not thousands, of people. Brief at 27 n.18. Yet, this argument is supported neither by the case law nor the amended complaint itself. In Kehr Packages, we addressed an analogous situation and found that the only victim of the defendants' alleged criminal activity was the company and not its shareholders or its guarantors. We reached this conclusion because "Kehr's individual shareholders and guarantors, and the holders of pledged collateral, were affected only indirectly." 926 F.2d at 1418-19; see also Hughes, 945 F.2d at 611 (noting that alleged scheme affected single victim, "albeit a class of victims," in rejecting RICO claim). Similarly, here the scheme affected the beneficiaries of the Estate only indirectly.

Additionally, throughout its amended complaint, the Estate maintains that the fraudulent conduct deprived it, the Estate, of its rightful share of the income. Indeed, according to the 1964 Partnership Agreement, the deceased party's share of the income is payable to his estate, not to his heirs. App. at 155. While it is true that the presence of only one victim, like the existence of only one scheme, does not necessarily preclude the finding of a RICO pattern, this fact clearly weighs against the finding of continuity. See United States Textiles, Inc. v. Anheuser-Busch Cos., 911 F.2d 1261, 1268 (7th Cir. 1990). Indeed, when there is only one victim and that victim is engaged in a business relationship with the defendant, the dispute between the parties may be nothing more than a civil controversy.

The fifth factor, the number of perpetrators, does appear to weigh in the Estate's favor. The district court stated that there was only one perpetrator, "Daniel Tabas or individuals under his control." Opin. at 8-9. But this conclusion is inherently contradictory for even if the other perpetrators are under Daniel's control, they still existed. In fact, the district court's description could be used to describe an organized crime family, yet clearly Congress meant RICO to cover organized crime. Nonetheless, this error is not significant, for even if the number were as large as the Estate argues, the fact that more than one person was involved in a scheme to defraud that lasted a substantial period of time cannot without more

establish continuity.  Indeed, in some ways this is the least important factor.  Cf. Wade v. Hopper, 993 F.2d 1246, 1251 (7th Cir.) (per curiam) (listing factors relevant for continuity determination similar to those listed in Barticheck but not including number of perpetrators), cert. denied, 114 S.Ct. 193 (1993); Morgan v. Bank of Waukegan, 804 F.2d at 975 (listing same factors in pre-H.J. Inc. case).  Thus, this factor does not place a heavy weight on the continuity side of the scale.

The final factor, the character of the unlawful activity, is perhaps most important in assuring that RICO is applied in a manner consistent with congressional intent. Congress aimed to prevent long-term criminal activity, but not to federalize every garden-variety claim of fraud.  "The concept of 'continuity' plays an important constraining role in the operation of the RICO statute" by requiring a court to examine not only the "period of time over which the predicate acts occurred or . . . during which any threatened criminal activity would be likely to last," but also the character of the predicate acts and the extent of the injury generated by the acts. Marshall-Silver, 894 F.2d at 596-97.  In this case the character of the alleged acts of mail fraud and the confined extent of the injury weigh heavily against the Estate.  "Repeated mailings in furtherance of a single scheme to inflict one fraudulent injury may be no indication of the underlying fraud's continuity."

<u>Shields Enters., Inc. v. First Chicago Corp.</u>, 975 F.2d 1290, 1295 (7th Cir. 1992).

As I already have noted, this case evolves from an ongoing dispute regarding the appropriate split of a partnership's profits. The allegations of fraud do not pertain to how Tabas Enterprises conducts its business, but only to its internal functioning. Moreover, unlike other conduct which can constitute racketeering activity, such as extortion, robbery, or murder, there is nothing inherently criminal in mailing a letter containing a check or a tax form. <u>See</u> 18 U.S.C. § 1961(1). Indeed, the vast majority of mailings undoubtedly are lawful. Thus, in this case the mailings could be regarded as racketeering activity only by reference to matters beyond the letters and their contents.

The unreasonableness of regarding the mailing of the thirty-nine $15,000 checks as RICO predicate acts in this case is demonstrated by considering what would have happened if the defendants had delivered the checks rather than mailed them. In that case, they could not have committed mail fraud and the Estate could not have pleaded a RICO case, as there would have been no predicate acts on which to base the complaint. Rather than seeking threefold damages under RICO, 18 U.S.C. § 1964(c), the Estate would have been limited to a state law claim -- even though at bottom the unlawful activity in both that hypothetical

case and this case involves conduct of precisely the same character. I thus ask the following question: is it conceivable that Congress intended that RICO could be applied to a defendant who mails substantial payments to the plaintiff, but not to the same defendant if it delivers the payments?[34] The question answers itself. Thus, the fact that this case involves mail fraud rather than some other type of fraud is entirely fortuitous, and that fortuity should not result in a windfall to the plaintiffs. But by ignoring the Bartichek factors, and therefore failing to inquire into the character of the unlawful activity, the majority endorses just that counterintuitive result.

I recognize that the complaint is rife with contentions that the defendants' activity defrauded the Estate out of its fair share of the partnership's income. Yet the Estate does not allege that the defendants' conduct has ramifications outside the confines of the immediate dispute regarding the division of the partnership's profits. Thus, the broader threat is minimal at most. See Meade v. Meade, 1991 WL 243539, *5 (E.D. Pa. Nov. 18, 1991) ("This is a dispute between a small number of parties, and

---

[34]While the majority answers that Congress did intend to distinguish between mailings and hand deliveries as the former but not the latter could be mail fraud, this answer misses my point. My point is that in considering the character of the unlawful acts in accordance with the sixth Bartichek factor, the use of the mails was purely fortuitous in this particular case and it was the alleged fraud and not how the checks were delivered which injured the Estate.

neither directly affects nor has wider implications for a large number of people. Actual and threatened societal injury is little, if any. Finally, each alleged act of mail and wire fraud forms part of one, extended scheme, reinforcing the essentially isolated nature of the alleged racketeering activity."), reconsideration denied, 1992 WL 6929 (E.D. Pa. 1992), aff'd, 998 F.2d 1004 (3d Cir. 1993) (table); Rumbaugh v. Chandler, 1991 WL 169046, *4 (E.D. Pa. Aug. 27, 1991) (App. at 1893-900) ("This action does not concern an extensive criminal enterprise whose long-standing, repeated conduct has caused and will continue to cause a severe injury to the community. Rather, it is a private dispute between two ex-partners that has continued over twelve years in various forms.").

I make one final but critical point with respect to the character of the unlawful activity in this case. I focus on this point because I regard the character of the activity as the most significant Barticheck factor in this case. As the majority points out, 39 of the predicate acts consist of the mailing of $15,000 checks to the Estate and the other two concern mailing tax forms. Reliance on such predicate acts is problematic because the Estate is pleading in essence that the defendants committed "mail fraud" by sending it money. I can conceive of cases in which a defendant's act of sending money may constitute fraud; perhaps, even, the defendants' activities (as alleged in this case) theoretically could be prosecuted under the mail fraud

statute,[35] although it must be remembered that "not every use of the mails . . . in connection with a scheme is punishable" as mail fraud. United States v. Frey, 42 F.3d 795 (3d Cir. 1994), slip op. at 3 (3d Cir. Dec. 13, 1994). But three undisputed facts belie the conclusion that this is therefore a RICO case. First, between March 1983 and September 1986, "Tabas Enterprises paid for various personal expenses incurred by Harriette [as well as] Daniel." Majority typescript at 4. Second, "[p]rior to Charles's death . . . the brothers appeared to have an arrangement under which Tabas Enterprises paid for many personal and business expenses." Majority typescript at 4 n.2 (emphasis added). Finally, as the majority indicates, plaintiffs acknowledge that as of the time of the state court lawsuit, "they believed Daniel was taking more than he was entitled to under the partnership agreement . . . They contend [only] that they did not know the extent to which they were being short-changed . . . ." Majority typescript at 5 n.3 (emphasis added).

These facts make difficult to accept the majority's conclusion that the "mailings [were] 'designed to lull [the Estate] into a false sense of security, postpone [its] ultimate complaint to the authorities, and therefore make the apprehension

_____

[35]See Schmuck v. United States, 489 U.S. 705, 714-15, 109 S.Ct. 1443, 1450 (1989) ("To the extent that Schmuck would draw from these previous cases a general rule that routine mailings that are innocent in themselves cannot supply the mailing element of the mail fraud offense, he misapprehends this Court's precedents.").

of the defendants less likely than if no mailings had taken place.'" Majority typescript at 35 n.18 (citation omitted). In any event, no matter how the Estate characterizes this case, and even if there were some fraudulent acts, this suit is first and last a dispute about how the partnership income should have been distributed. Seen in this context, the mailing of the checks was so benign an act that it is a thin foundation on which to build the continuity element. At bottom, regardless of the pejorative words which the Estate uses to characterize the defendants' conduct, this case involves a commercial dispute over a discrete issue, the amount due to the Estate in its monthly draws. Such a dispute is simply not a RICO controversy.[36]

I recognize that the majority has listed numerous questionable expenses charged against Tabas Enterprises and I further acknowledge that the defendants may have state law liability for some of these expenses. But it is important in considering this case to keep in mind that the incurring of these expenses is not the predicate criminal conduct charged in this case. Rather, the predicate acts to establish RICO jurisdiction are the use of the mails to disburse checks and to distribute forms. Overall, therefore, after consideration of the character

_____

[36]Keeping in mind that this case is really about who gets to use the partnership income for what purpose, consider what would have happened if the defendants had paid nothing to the Estate over the three-year period in which they actually paid $585,000. The Estate would have gotten nothing and there would not be a RICO case.

of the unlawful activity, together with the other relevant Barticheck factors, both qualitatively and quantitatively, I conclude that the Estate has failed to establish a genuine issue of material fact over continuity and that this case is yet another attempt by a plaintiff "to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions." Midwest Grounding Co., 976 F.2d at 1025.

In reaching my conclusions, I have taken particular note of our opinion in Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250 (3d Cir. 1994), which affirmed the district court's judgment granting certain of the defendants "summary judgment on the RICO claim against them for failure to show relatedness and continuity . . . essentially for the reasons given by the district court." Id. at 1254. The district court opinion is reported as Jordan v. Berman, 792 F. Supp. 380 (E.D. Pa. 1992). Jordan is a complex case involving a controversy between tenants and a landlord, the details of which I need not discuss. Germane here is the district court's conclusion that the plaintiffs had not adduced "evidence from which one could reasonably find a pattern of racketeering activity under prevailing case law." Id. at 388. The district court explained the basis for its decision as follows:

> Few relationships in our society seem to engender more conflict than that of landlord and tenant. The aggressive landlord and the disgruntled tenant have almost become stereotypical. The instant case involves a typical landlord-tenant dispute about the construction of a lease and what sums or

> services the respective parties are entitled
> to. Permitting trash to accumulate for a
> day, disrupting utility service for half a
> day and vigorously pursuing a plausible
> contract interpretation are generally not the
> kind of things from which RICO cases are
> made. The actions of defendants and their
> agents, however characterized, do not pose
> the type of significant societal threat that
> RICO was designed to deter or penalize.

Id. (emphasis added). By affirming "essentially for the reasons given by the district court," we approved the foregoing statement, even though the case involved the use of the mails and thus, in theory, could have been a RICO case.

If we substituted the relationship between partners for the landlord-tenant relationship, the underscored language in the above quotation would describe this case. Certainly the partnership relationship, like the landlord-tenant relationship, is a frequent source of disputes. The dispute in this case, to quote from and to paraphrase Jordan v. Berman:

> involves a typical [partnership] dispute
> about the construction of a [partnership
> agreement] and what sums . . . the respective
> parties are entitled to. . . . The actions
> of defendants and their agents, however
> characterized, do not pose the type of
> significant societal threat that RICO was
> designed to deter or penalize.

Thus, this case is no more a RICO case than was Jordan.

In coming to my conclusions I also have found it useful to consider United States v. Pelullo, 964 F.2d 193 (3d Cir. 1992), a case which the majority cites and on which the Estate relies. Pelullo is a post-H.J. Inc. case in which we found that

a RICO violation could be proved based on a closed-ended scheme that lasted 19 months.  In Pelullo, the defendant was a chief executive officer of The Royale Group, Ltd., a publicly held corporation which through subsidiaries acquired six hotels in Miami Beach.  In June 1984, the hotels obtained a $13.5 million loan from a subsidiary of American Savings and Loan Association. Under the terms of the loan, $6.2 million was to be used for renovation, with American retaining this portion and disbursing the funds as renovation costs were incurred.  To obtain a disbursement, Royale was required to submit draw requests which set forth a certified itemization of the costs.

The indictment charged Pelullo with three fraudulent schemes:  (1) defrauding American, Royale, and Royale's shareholders by submitting false documents in connection with certain draw requests; (2) defrauding Royale of $114,000 by diverting cash from one of its subsidiaries to repay a debt Pelullo owed; and (3) defrauding Royale of approximately $500,000 by diverting money for uses other than for the purposes of the loans.  Accordingly, the alleged number of schemes in Pelullo was larger than the one scheme alleged here.  And while the number of victims in Pelullo could be characterized as small, the nature of the unlawful activity had a different ring to it, because in Pelullo the alleged perpetrator was an officer in a public company and the main victims (American and Royale) were public entities.  Moreover, the alleged fraud was not confined to

Royale's internal operations, but took place in the context of its normal external business operations. Thus, even though the Estate relies on Pelullo, that case involved much more than a dispute between partners and does not support the Estate's position. Pelullo nevertheless is instructive to illustrate the contrast between a real RICO case and the Tabas's dispute.

While I do not suggest that a plaintiff alleging a single fraudulent scheme injuring a single victim in the context of a private dispute never can maintain a RICO claim, it would be unusual for such a case to be covered by RICO, especially where the alleged predicate acts are mail fraud. In reaching this conclusion, I am cognizant that "RICO's pattern requirement does not require the existence of more than one 'scheme,'" Marshall-Silver, 894 F.2d at 596, and that the Supreme Court has declared that the RICO statute should be read broadly "to reach both 'legitimate' and 'illegitimate' enterprises," Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499, 105 S.Ct. 3275, 3286 (1985). Furthermore, I recognize that the Court has noted that civil RICO appears to be "evolving into something quite different from the original conception of its enactors," and that this problem is for Congress, not the courts, to correct. Id. at 499-500, 105 S.Ct. at 3287. See also NOW v. Scheidler, 114 S.Ct. 798, 806 (1994).

Yet our precedents clearly establish that Congress did not intend RICO to cover every garden-variety fraud. See

Marshall-Silver, 894 F.2d at 597; accord Midwest Grinding Co., 976 F.2d at 1025 ("[I]t is equally evident that RICO has not federalized every state common-law cause of action available to remedy business deals gone sour."). Rather, the Supreme Court, "by refocusing the pattern requirement on the sort of long-term criminal activity that carries some quantum of threat to society," Midwest Grinding Co., 976 F.2d at 1025, has attempted "to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law," id, at 1022; see also Marshall-Silver, 894 F.2d at 596-97 (noting that continuity plays an important role in constraining operation of RICO statute to only those activities which threaten societal injury). Moreover, the Supreme Court has confined the scope of RICO by limiting the persons who can be liable under 18 U.S.C. § 1962(c). See Reves v. Ernst & Young, 113 S.Ct. 1163 (1993).

In my view, the majority's opinion inexorably will result in federalizing numerous internal business disputes in a way that Congress never could have intended. The opinion as applied in this circuit will lead attorneys to repackage as RICO actions ordinary commercial controversies in which the parties have communicated by mail or wire. Indeed, it seems obvious that the principles of this case could be applied to routine commercial disputes in many situations in which the parties have been in an ongoing relationship, e.g., partnerships, tenancies, employer-employee, service contracts, supply contracts, equipment

rentals, brokerage accounts, and others as well.  A party in such a relationship, dissatisfied with the other party's performance, will be able to establish RICO jurisdiction by alleging fraud and pointing to the other party's numerous mailings in furtherance of its understanding of the terms of the relationship.  For the foregoing reasons, I dissent.  Chief Judge Sloviter,[37] and Judges Hutchinson, Scirica, Cowen, and Nygaard[38] join in this dissent.

---

[37]Judge Sloviter joins with the following statement. Although I do not agree with every detail of Judge Greenberg's dissent, I join it because it comes closest to expressing my frustration that the analytic litany that the courts must now conduct in civil RICO cases leads to a result, the federalization of garden variety fraud, that is directly contrary to Congress's expressed intent.

[38]Judge Nygaard joins in the dissent, believing that the district court properly granted summary judgment in favor of the defendants.  He bases his conclusion that summary judgment was proper, however, upon plaintiffs' failure to show facts giving rise to mail fraud under RICO rather than upon a failure to establish a pattern of racketeering activity.  Under Judge Nygaard's analysis, the mailings here were, as in United States v. Maze, 414 U.S. 395, 94 S.Ct. 645 (1974), merely post-fraud means of transmitting matter from one place to another.  Judge Nygaard believes that inasmuch as the fraud "had reached fruition," at the time of the mailing, it cannot be said that the mailings in question were for the purpose of executing the scheme, as required by the statute.  Kann v. United States, 323 U.S. 88, 65 S.Ct. 148 (1944).  Hence, it was not "an essential step" in the success of the fraud.  Schmuck v. United States, 489 U.S. 705, 714, 109 S.Ct. 1443, 1450 (1989).