**Norman BARDSLEY, Plaintiff,**

v.

**POWELL, TRACHTMAN, LOGAN, CARRLE & BOWMAN, P.C., et al., Defendants.**

**No. 95–CV–2287.**

United States District Court, E.D. Pennsylvania.

Feb. 20, 1996.

Steven E. Angstreich, Steven P. Burkett, Michael Coren, Levy, Angstreich, Finney, Baldante, Mann & Burkett, P.C., Philadelphia, PA, for Plaintiff.

Andrew L. Braunfeld, Margaret Mary Maguire, Masterson, Braunfeld, Maguire and Brown, Norristown, PA, for Powell, P.C., Joel P. Perilstein and Jonathan K. Hollin.

Mark C. Schultz, Sherr, Joffe & Zuckerman, P.C., W. Conshocken, PA, for Scott E. Bardley, Leigh Bardley and David E. Miller.

### *MEMORANDUM AND ORDER*

JOYNER, District Judge.

This Memorandum and Order addresses four outstanding motions filed by the plaintiff in this dispute arising from a struggle for control of Inofast Manufacturing, Inc. ("Inofast"), a Pennsylvania corporation. The plaintiff is Norman Bardsley ("Norman"), a United States citizen domiciled in Austria, and a shareholder and director of Inofast. Norman commenced this action by filing a complaint on April 19, 1995 and an amended complaint on July 5, 1995. The defendants include the Montgomery County law firm of Powell, Trachtman, Logan, Carrle & Bowman, P.C. ("Powell, Trachtman"), which served as counsel to Inofast; Joel P. Perlstein and Jonathan K. Hollin, who are members of the Powell, Trachtman firm; Scott Bardsley ("Scott"), who is Norman's twin brother and a shareholder of Inofast; Leigh Bardsley ("Leigh"), who is Scott and Norman's father; and David Miller. Inofast is a nominal defendant.

In his amended complaint, Norman alleges that Scott and the other defendants entered into a series of improper transactions for the

purpose of divesting Norman of his majority shareholder status. The amended complaint contains five counts. In the first count, Norman seeks equitable and declaratory relief under §§ 10(b) and 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78kk (the "Exchange Act"). In Count II, Norman alleges that he is entitled to treble damages under § 1964(c) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 ("RICO"). In Counts III–V, Norman asserts an entitlement to relief under the common law theories of legal malpractice, waste and mismanagement, and breach of the duty of good faith and fair dealing, respectively. Norman also seeks an award of punitive damages.

As we noted at the outset, our ruling today resolves four motions. On September 15, 1995, Scott, Leigh and Mr. Miller (collectively, the "Individual Defendants") through their attorneys, Sherr, Joffe & Zuckerman, P.C. ("Sherr, Joffe"), submitted the first of these motions, one seeking the dismissal of the amended complaint, or in the alternative, a stay of the proceeding pending the resolution of a related action in the Court of Common Pleas of Montgomery County. On the same day, the Powell, Trachtman firm and Messrs. Perilstein and Hollin (collectively, the "Law Firm Defendants") also filed a motion to dismiss. On October 16, Inofast, also represented by the Sherr, Joffe firm, filed a motion to stay the proceeding. Finally, on November 6, Norman submitted a response to Inofast's motion and a cross-motion to disqualify the Sherr, Joffe firm from representing Inofast. For the reasons set forth below, we conclude that the amended complaint must be dismissed. As a result, we will grant the motions to dismiss and deny as moot both Inofast's motion to stay and Norman's motion to disqualify counsel.

## BACKGROUND

The facts, as recited in the amended complaint, are as follows. Inofast is engaged in the business of manufacturing and distributing fasteners. As of 1985, Norman held 18,750 shares and Scott owned 11,250 shares. Thus, Norman controlled 62.5% of Inofast's issued stock, while Scott's shares accounted for the remaining 37.5% of the issued stock. Scott was Inofast's president, managing its day-to-day operation, while Norman assumed the role of passive investor. In 1986, 1987 and 1989, Norman, Scott, Leigh, Mr. Miller and Guy Mallick entered into three separate shareholders' agreements, pursuant to which the company's issued and outstanding stock would be apportioned as follows:

| Norman | 35% |
| Scott | 25% |
| Mr. Mallick | 20% |
| Mr. Miller | 10% |
| Leigh | 10% |

The parties to the agreements contemplated that the transfer of shares to Leigh and Messrs. Mallick and Miller would be achieved via gifting from Norman and Scott. Despite this agreement, the shares were never gifted due to an unresolved dispute regarding the party who would be liable for the associated gift tax. Thus, according to the plaintiff, the shareholders' agreements were never "implemented;" and he continued to maintain control over 62.5% of the issued and outstanding stock, the shareholders' agreements notwithstanding.

In 1991, Norman returned to the United States and began working actively for Inofast for the purpose of establishing an Austrian subsidiary. Upon his return, Norman discovered that Inofast was in financial turmoil. According to the amended complaint, gross revenues were falling, the company was taking on more debt, and the number of employees had fallen from 43 to 20. As a result of Inofast's deteriorating fiscal state, Norman became a personal guarantor of one-half of the company's debt. Moreover, he decided that dramatic action was called for, and announced his intention to utilize his majority status to replace management. When the defendants realized what Norman intended to accomplish, they hatched a plan in an effort to defeat his bid to control the company. Accordingly, the defendants, without Norman's knowledge or approval, caused a total of 12,857.143 additional shares to be issued to Scott, Leigh and Mr. Miller, so that together they could control Inofast.

Thus, prior to a shareholders' meeting scheduled for April 26, 1993, in response to a request for the names of the shareholders

entitled to vote at the meeting, Mr. Perilstein informed Norman by letter dated April 21 of the identity of the shareholders and their respective ownership interests, as follows:

| Norman | 18,750 shares | (43.75%) |
| Scott | 13,392.857 shares | (31.25%) |
| Leigh | 5,357.143 shares | (12.50%) |
| Mr. Miller | 5,357.143 shares | (12.50%) [1] |

Norman thus became aware that additional shares had been issued. When he requested information regarding the authority and basis for the disputed transactions, the defendants refused to so inform him. At the April 26 shareholders' meeting, over Norman's objection, Scott and Leigh appointed Mr. Perilstein to serve as the company's judge of elections. Mr. Perilstein then ruled that the disputed 12,857.143 shares could be voted. Mr. Miller gave his proxy to Leigh, who voted in support of Scott's position. Thus, the board of directors elected at the April 26 meeting consisted of Scott, Norman and Leigh. Norman's bid to take control of the company was thereby thwarted.

Another shareholders' meeting was convened in October of 1993, by which time Norman had returned to Austria. Norman was given advance notice of the meeting and requested an agenda, but his request went unanswered. At the October, 1993 meeting, Scott and Leigh approved the issuance of an additional 5,359 bonus shares to Scott, bringing his total to 18,751.857 shares, 1.857 more shares than Norman held. This transaction occurred without Norman's knowledge or approval. Norman alleges that if he had known that the directors were to vote on an award of bonus shares for Scott, then he would have attended the meeting and voted against the measure.

In preparation for the 1994 shareholders' meeting, Norman again asked for a list of current shareholders. In response to this request, Mr. Hollin informed him by letter that "the shareholders identified on that last list provided to you by Mr. Perilstein is still accurate as far as the identity of the current shareholders." It was therefore not until the 1994 shareholders' meeting convened that Mr. Perilstein informed Norman that Scott had received the 5,359 bonus shares. Scott and Leigh again appointed Mr. Perilstein as judge of elections over Norman's objection. Mr. Perilstein again ruled that the disputed shares could be voted. Scott, Leigh and Norman were then reelected to another term on the board of directors.

The defendants persisted in refusing to inform Norman of the basis for the issuance of the disputed shares. Finally, on August 22, 1994, Mr. Hollin notified Norman by letter that "[t]he basis of the issuance of [the disputed] shares was to effectuate share distribution provided for in the July 5, 1989 Shareholders Agreement." Mr. Hollin added that an agreement the company reached with Mr. Mallick when he resigned from Inofast "could [also] be considered authorization" for the issuance of the disputed shares. Norman contends that neither the shareholders' agreement nor the agreement regarding Mr. Mallick can legally justify the issuance of the disputed shares. Thus, he argues that the issuance was achieved fraudulently, without legal basis, and for the improper purpose of usurping his majority voting power.

Norman initiated a lawsuit in the Court of Common Pleas for Montgomery County on December 2, 1993. In that action, Norman sought a declaration to the effect that the 1989 shareholders' agreement was invalid and requested the court to rescind the issuance of the disputed stock. This lawsuit was voluntarily withdrawn on May 19, 1994. On June 16, 1994, Norman commenced a second action in Montgomery County, in which he sought injunctive and compensatory relief under the following three theories of liability: (1) violation of fiduciary duty, (2) fraud and misrepresentation; and (3) violation of Pennsylvania's Business Corporation Law. The second lawsuit is currently pending.

### DISCUSSION

#### A. Motion to Dismiss Standard

A motion filed pursuant to Fed.R.Civ.P. 12(b)(6) is the proper means by which a defendant challenges the legal sufficiency of a complaint. The onus is on the defendant to show that the plaintiff has failed to set forth a cognizable claim. *Kehr Packages, Inc. v.*

---

**1.** By this time, Mr. Mallick had left the company.

*Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.), *cert. denied*, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). In considering a motion to dismiss, the complaint's allegations must be construed favorably to the pleader. The court must accept as true all of the plaintiff's factual allegations and draw from them all reasonable inferences. *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991) (citations omitted). Thus, the court will grant a Rule 12(b)(6) motion only if the non-moving party cannot prevail legally under the set of facts alleged. *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990).

### B. *The Exchange Act Claim*

■ In his amended complaint, Norman alleges that he is entitled to relief under both § 10(b) and § 29(b) of the Exchange Act. The defendants argue in their motions that the Exchange Act claim should be dismissed on the following three grounds: (1) that pursuant to 15 U.S.C. § 77(c), the anti-fraud provisions of the Exchange Act do not pertain in a case where the securities are issued to persons in a single state; (2) that the Court lacks subject matter jurisdiction over the instant matter, since plaintiff has failed to allege that the defendants utilized the mails or some other instrumentality of interstate commerce to perpetuate the alleged fraud; and (3) that the claim is barred by the applicable limitations period. After careful consideration of these arguments, we have concluded that while the defendants' first two arguments lack merit, the contention regarding the limitations period is persuasive.

Defendants base this argument on *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), a case in which the Supreme Court held that a plaintiff must bring his claim under § 10(b) and Rule 10b–5 "within one year after the discovery of facts constituting the violation and within three years after such violation." *Id.* at 364, 111 S.Ct. at 2782; *see Gatto v. Meridian Medical Assocs., Inc.*, 882 F.2d 840, 844 (3d Cir.1989) (§ 10(b) plaintiff must bring his claim within one year of discovery of facts underlying the claim and within three years of the transac-

tion itself), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990); *Gurfein v. Sovereign Group*, 826 F.Supp. 890, 901–02 (E.D.Pa.1993) (following *Gilbertson* ).

We must therefore determine the time at which Norman obtained notice of the facts underlying his claim. Defendants contend that the cause of action accrued in April of 1993, when Norman became aware that the 12,857.143 shares had been issued. For his part, Norman asserts he had no notice of the facts supporting the claim until August 22, 1994, when Defendants informed him that the additional shares had been issued either pursuant to the 1989 shareholders' agreement or pursuant to the agreement regarding Mr. Mallick's resignation. This argument is belied, however, by the concession Norman makes in his amended complaint regarding his state of mind in the aftermath of the 1993 shareholders' meeting: he "assume[d] that the 1989 Shareholders' Agreement had been somehow clandestinely resurrected and invoked by Defendants ... to justify and authorize the disputed shares' issuance." Am.Compl. ¶ 42. Indeed, Norman filed suit in the Court of Common Pleas in December of 1993, seeking a declaration that the 1989 agreement could not serve to justify the issuance of the disputed stock.

Thus, the information he possessed when he filed the initial suit in Montgomery County was sufficient to support his Exchange Act claim. Since Norman concedes that he filed that action on December 2, 1993, and that he assumed that Defendants were pointing to the 1989 shareholders' agreement as the justification for the disputed transactions before he filed the first lawsuit, his 1995 filing of the Exchange Act claim in this Court was outside the bounds of the limitations period. Accordingly, we are compelled to dismiss Norman's Exchange Act claim.

### C. *The RICO Claim*

As noted above, Norman's amended complaint also purports to state a claim under RICO. The defendants argue that the RICO claim should be dismissed on the grounds that Norman has failed to allege facts which show a pattern of racketeering activity. RICO allows "[a]ny person injured in his

business or property by reason of a violation of section 1962 of this chapter" to bring suit in the appropriate district court and to "recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). Section 1962 enumerates four "protected activities," each of which requires proof of either "a pattern of racketeering activity" or "collection of an unlawful debt." RICO provides that a "pattern of racketeering activity" requires, at a minimum, two acts of racketeering activity occurring within a ten year period. § 1961(5).

■ Confronted with the question of what constitutes a pattern of racketeering activity, the Supreme Court examined RICO and its legislative history and concluded that a "pattern" required "continuity plus relationship;" that is, a plaintiff must plead and prove "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). Thus, RICO was enacted not to address sporadic activity, but instead to combat "activities that amount to or threaten long-term criminal activity." *Id.* at 243 n. 4, 109 S.Ct. at 2902 n. 4; *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

Accordingly, the two-prong test set forth by the Supreme Court compels us to consider both relatedness and continuity when determining whether a plaintiff has pleaded facts sufficient to meet the pattern of racketeering activity requirement. As for the first element, the Court concluded that the predicate acts are sufficiently related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J.,* 492 U.S. at 240, 109 S.Ct. at 2901 (citation omitted). With respect to the second prong, the Court noted that continuity refers "either to a closed period of repeated conduct or to past conduct that by its nature

projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902; *see Philadelphia Reserve Supply Co. v. Nowalk & Assocs., Inc.,* 864 F.Supp. 1456, 1461 (E.D.Pa.1994) ("Continuity means that the alleged racketeering scheme must either be open-ended, that is threatening continuing racketeering activity, or close-ended but lasting a substantial period of time."). Absent a threat of repetition, therefore, the Court concluded that a plaintiff could make out a RICO claim only by showing that the related predicate acts were closed-ended in nature and extended "over a substantial period of time." *Id.*

■ Our Court of Appeals has further expounded upon the intricacies of RICO's pattern requirement. In the recent case of *Tabas v. Tabas,* 47 F.3d 1280 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995), the court held that the continuity inquiry requires an examination of the underlying scheme in its entirety. The court reasoned that while " 'the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis.' " *Id.* at 1294 (quoting *Kehr Packages,* 926 F.2d at 1414). With this as backdrop, a court is to consider the duration of the alleged scheme, which remains "the *sine qua non* of continuity." *Hindes v. Castle,* 937 F.2d 868, 873 (3d Cir.1991); *see H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902 (noting that related predicate acts "extending over a few weeks or months" do not satisfy the continuity requirement). With regard to duration, the Third Circuit has generally found that conduct lasting for no more than twelve months will not satisfy the continuity requirement. *Tabas,* 47 F.3d at 1293 (citations omitted). Finally, in the event a court cannot reach a clear conclusion under either a closed- or open-ended continuity analysis, it should then turn to the factors set forth in *Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36, 39 (3d Cir.1987), for guidance.[2] *Tabas,* 47 F.3d at 1296 n. 21.

---

2. These factors include "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number

of victims, the number of perpetrators, and the character of the unlawful activity."

■ Thus, in order to evaluate whether the facts set forth in the amended complaint are sufficient to meet the continuity prong, we must first determine the duration of the alleged scheme. As mentioned above, Norman asserts that the defendants implemented the alleged scheme after they became aware that he intended to exert his majority power to replace management. The amended complaint reveals that Norman requested, in the early spring of 1993, that a shareholders' meeting be convened. Moreover, Norman alleges that the defendants knew of his intentions by that time. It was not until Norman threatened to upset the status quo, therefore, that the defendants had any reason to plot Norman's ouster. Thus, we must conclude that the defendants commenced implementation of the alleged scheme in the spring of 1993.

By so concluding, we must necessarily reject Norman's assertion that the alleged scheme commenced in 1989. Norman contends that Scott's execution of the shareholders' agreement marked the beginning of the alleged scheme, since Scott "knew at that time that plaintiff was unwilling to give up majority control over Inofast, and that Scott Bardsley had no intention of performing the . . . agreement." Plaintiff's Memo. at 23. First, we note that Norman's argument regarding his unwillingness to yield his majority status is belied by his admission that he agreed to a 35% share of ownership when he signed the three shareholders' agreements. Norman further admits that he was prepared to gift stock to the designated recipients once the gift tax matter had been resolved. Thus, Norman had indeed agreed in principle to yield his majority status in 1989. Second, Norman fails to explain the relevance of his assertion that Scott intended to ignore the 1989 agreement from the very beginning. Indeed, there is no allegation that Scott had some nefarious purpose in mind when the 1989 agreement was executed. Norman concedes in the amended complaint that Scott had no reason to dilute Norman's position, that is, to implement some scheme, until Norman began to hint that he would use his voting power to change the company's leadership. Thus, the 1989 agreement, according to a fair reading of the complaint, was merely a *post hoc* justification for the allegedly improper issuance of shares, and not part of the alleged scheme.

The amended complaint further reveals, and Norman himself concedes in his memorandum in opposition to the motions to dismiss, that the scheme's goal had been realized by April 26, 1993, when the defendants had successfully seized control of the company pursuant to the votes cast at the shareholders' meeting. Arguably, we might conclude that the scheme extended through October of 1993, when Norman's position was further diluted by the issuance of Scott's bonus shares without Norman's knowledge or approval. Even so, for closed-ended continuity purposes, the amended complaint demonstrates that the defendants concocted and executed the alleged scheme over a period of no more than seven to eight months, that it was directed at a single individual, and that it was implemented for the discrete purpose of divesting Norman of control of the company. And as the applicable cases make clear, a narrowly tailored scheme executed over a brief period of time does not satisfy RICO's continuity requirement. *See Tabas,* 47 F.3d at 1293 (reviewing five post-*H.J.* RICO decisions in the Third Circuit and concluding that "conduct lasting no more than twelve months [does] not meet the standard for closed-end continuity").

■ Likewise, we conclude that the facts set forth in the amended complaint fail under an open-ended continuity analysis. The open-ended continuity inquiry is triggered when the plaintiff brings his suit before he can establish closed-ended continuity. *Id.* at 1295. Thus, in order to establish continuity under the open-ended framework, a plaintiff must plead and prove the existence of "the *threat* of continuity." *H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902. The allegations must therefore amount to or pose the threat of continuing criminal activity. *Kehr Packages,* 926 F.2d at 1417. Coupled with the emphasis on duration under closed-ended analysis, the requirement that there be a threat of continued criminal activity in the open-ended context effectuates the Congress's wish that

RICO be utilized to combat long-term criminal activity.

In the instant case, we conclude that Norman has failed to set forth facts to support an inference that continued criminal activity looms. By Norman's own admission, the alleged plot was hatched for the specific purpose of thwarting Norman's bid to exercise his power within the company. The scheme's end has been achieved. Thus, we cannot reasonably envision continued unlawful behavior. At its base, this case involves the alleged execution of a plan by a minority shareholder and his cohorts to wrest control of a closely-held company from the majority shareholder. The defendants devised and executed the plan in less than a year's time, and now control the corporation. Thus, our ruling today respects the notion that RICO was enacted to "reach activities that amount to or threaten long-term criminal activity." *H.J.*, 492 U.S. at 243 n. 4, 109 S.Ct. at 2902 n. 4. Accordingly, because Norman has failed to allege facts sufficient to satisfy the continuity requirement, we are compelled to dismiss his RICO claim.

### D.  *The Common Law Claims*

■ We have concluded that the two claims arising under federal law are not viable. In such an instance, our Court of Appeals instructs us that we should exercise supplementary jurisdiction over the remaining claims only under "extraordinary circumstances." *Shaffer v. Board of Sch. Directors of the Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir.1984) (citing *Weaver v. Marine Bank*, 683 F.2d 744 (3d Cir.1982)); *see Nutis v. Penn Merchandising Corp.*, 610 F.Supp. 1573, 1583 (E.D.Pa.1985) (dismissing plaintiff's state law claims after finding that plaintiff had failed to state viable claims under the federal securities laws and RICO), *aff'd*, 791 F.2d 919 (3d Cir.1986). We conclude that such extraordinary circumstances are not present here, especially since Norman is currently prosecuting a similar action in Montgomery County, where he can pursue relief under state law. Accordingly, we will dismiss the amended complaint in its entirety.

*CONCLUSION*

For the reasons set forth above, the defendants' motions to dismiss will be granted and Norman's amended complaint will be dismissed. In light of our disposition, we will deny as moot the motion to disqualify counsel and the motion for a stay. An appropriate order follows.

### *ORDER*

AND NOW, this 20th day of February, 1996, upon consideration of Law Firm Defendants' Motion to Dismiss and Individual Defendants' Motion to Dismiss, and the response thereto, it is hereby ORDERED, for the reasons set forth in the preceding Memorandum, that said Motions are GRANTED. Plaintiff's Amended Complaint is hereby DISMISSED.

IT IS FURTHER ORDERED, upon consideration of Plaintiff's Motion to Disqualify Counsel and Nominal Defendant Inofast's Motion for a Stay, that said Motions are DENIED as MOOT.